# DEPARTMENT OF TRANSPORTATION *v.* WHITE OAK CORPORATION ET AL.
## (SC 17828)

Rogers, C. J., and Norcott, Katz, Zarella and Schaller, Js.

Argued October 24, 2007—officially released May 20, 2008

*Lawrence Russ*, assistant attorney general, with whom was *Howard K. Levine*, for the appellant (plaintiff).

*Raymond A. Garcia*, with whom were *Jane I. Milas*, *Nicole Liguori Micklich* and, on the brief, *James E. Regan*, for the appellee (named defendant).

*Opinion*

ROGERS, C. J. The principal issue in this appeal is whether General Statutes § 4-61,[1] which waives the state's sovereign immunity with respect to certain

---

[1] General Statutes § 4-61 provides in relevant part: "(a) Any person, firm or corporation which has entered into a contract with the state, acting through any of its departments, commissions or other agencies, for the design, construction, construction management, repair or alteration of any highway, bridge, building or other public works of the state or any political subdivision of the state may, in the event of any disputed claims under such contract or claims arising out of the awarding of a contract by the Commissioner of Public Works, bring an action against the state to the

claims arising under public works contracts, permits a general contractor to commence a second arbitration against the state to pursue claims that previously had been, or could have been, arbitrated between the parties in a prior action. The plaintiff, the state department of transportation (department), appeals from the judgment of the trial court denying its claim seeking a permanent injunction barring the named defendant, White Oak Corporation (White Oak),[2] from arbitrating a claim for delay damages arising under a public works contract. The department claims that the trial court improp-

superior court for the judicial district of Hartford for the purpose of having such claims determined . . . .

"(b) As an alternative to the procedure provided in subsection (a) of this section, any such person, firm or corporation having a claim under said subsection (a) may submit a demand for arbitration of such claim or claims for determination under (1) the rules of any dispute resolution entity, approved by such person, firm or corporation and the agency head and (2) the provisions of subsections (b) to (e), inclusive, of this section, except that if the parties cannot agree upon a dispute resolution entity, the rules of the American Arbitration Association and the provisions of said subsections shall apply. The provisions of this subsection shall not apply to claims under a contract unless notice of each such claim and the factual bases of each claim has been given in writing to the agency head of the department administering the contract within the time period which commences with the execution of the contract or the authorized commencement of work on the contract project, whichever is earlier, and which ends two years after the acceptance of the work by the agency head evidenced by a certificate of acceptance issued to the contractor or two years after the termination of the contract, whichever is earlier. A demand for arbitration of any such claim shall include the amount of damages and the alleged facts and contractual or statutory provisions which form the basis of the claim. No action on a claim under such contract shall be brought under this subsection except within the period which commences with the execution of the contract or the authorized commencement of work on the contract project, whichever is earlier, and which ends three years after the acceptance of the work by the agency head of the department administering the contract evidenced by a certificate of acceptance issued to the contractor or three years after the termination of the contract, whichever is earlier. Issuance of such certificate of acceptance shall not be a condition precedent to the commencement of any action. . . ."

[2] Although the American Arbitration Association also was named as a defendant in the proceedings before the trial court, it has not participated in the present appeal.

erly refused to issue an injunction because the second arbitration is barred by the doctrine of sovereign immunity, the doctrine of res judicata and the statute of limitations in § 4-61 (b).[3] We agree with the department's first claim, and, accordingly, reverse the judgment of the trial court.

The record reveals the following facts and procedural history. On June 6, 1994, White Oak and the department executed a public works contract for the construction of the Tomlinson bridge in New Haven. Construction was scheduled to commence on September 4, 1994, and to be completed by January 5, 1998. After experiencing numerous delays in construction, however, White Oak, the department and White Oak's surety agreed "that a new contractor [should] be employed to perform the remainder of the [c]ontract" and, accordingly, on April 28, 2000, they executed an assignment agreement whereby Cianbro Corporation (Cianbro) became the successor contractor. Construction of the Tomlinson bridge subsequently was completed on December 31, 2001.

Thereafter, White Oak filed a notice of claim against the department and a demand for arbitration with the American Arbitration Association pursuant to § 4-61 (b) (first arbitration). In its notice of demand, White Oak sought $93,793,891.11 in damages for the department's alleged wrongful termination of the contract. In response, the state filed an answer, special defenses and various counterclaims seeking, in relevant part, damages for increased costs caused by the delays in construction. The arbitration panel found in favor of the department with respect to White Oak's wrongful termination claim, concluding that "no termination of

---

[3] The department appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

White Oak actually [had] occurred." The arbitration panel also found in favor of the department with respect to its counterclaims seeking damages for certain increased costs, and awarded the department $1,169,648.33 in damages. The trial court, *Berger, J.,* subsequently confirmed the arbitration award.

Thereafter, White Oak filed a second notice of claim against the department, followed by a second demand for arbitration, seeking $110,314,807 in damages, plus interest, for delays associated with the construction of the Tomlinson bridge (second arbitration). In response, the department filed the present action in the trial court seeking, inter alia, a permanent injunction barring the second arbitration. The department claimed that the second arbitration was barred by: (1) the doctrine of sovereign immunity because § 4-61 waives the state's sovereign immunity only with respect to a single action or arbitration wherein all disputed claims arising under a public works contract must be resolved; (2) the doctrine of res judicata because White Oak's claims previously had been arbitrated, or could have been arbitrated, in the first arbitration; and (3) the statute of limitations, which began to run on the date on which the contract had been terminated by virtue of the assignment to Cianbro.[4]

The trial court, *Berger, J.,* denied the department's request for a permanent injunction.[5] The trial court concluded that the second arbitration was not barred by the doctrine of sovereign immunity because, to the

---

[4] White Oak moved to dismiss the present action for lack of subject matter jurisdiction, claiming that it is the "sole province of the arbitrator to decide whether . . . he or she has jurisdiction over White Oak's claims." The trial court, *Berger, J.,* denied White Oak's motion, concluding that it had subject matter jurisdiction to determine the arbitrability of White Oak's claims under § 4-61.

[5] The trial court, *Bryant, J.,* previously had granted White Oak's motion for a temporary injunction pending the issuance of a final decision on its claim.

extent that § 4-61 requires a singular demand for arbitration, White Oak had fulfilled this requirement in that its "July 25, 2001 revised amended demand and companion revised amended notice of claim [in the first arbitration had] included a claim for delay damages . . . ." The trial court noted that "[c]ourts and arbitration panels regularly bifurcate matters as needed and as appropriate. To argue that the process of deciding one issue first forecloses further consideration of other issues, if not waived, and if appropriate, has no merit. In this case, it is clear that while the [first arbitration] panel did make certain findings concerning extensions and delays, it considered its only task—for whatever reason, whether notice deficiencies or stipulations—to be the wrongful termination claim . . . ."[6]

On appeal, the department claims that the trial court improperly declined to issue a permanent injunction. We conclude that the waiver of sovereign immunity set forth in § 4-61 requires all existing disputed claims arising under a public works contract to be litigated or arbitrated in a single action. Because White Oak's claim for delay damages existed at the time its notice of claim had been filed in the first arbitration; see footnote 9 of this opinion; and because White Oak failed to pursue its claim in that proceeding, we conclude that it is barred

[6] The trial court further concluded that the second arbitration was not barred by the doctrine of res judicata pursuant to *LaSalla* v. *Doctor's Associates, Inc.*, 278 Conn. 578, 898 A.2d 803 (2006), and *Stratford* v. *International Assn. of Firefighters, AFL-CIO, Local 998*, 248 Conn. 108, 728 A.2d 1063 (1999). Additionally, the trial court rejected the state's claim that the statute of limitations had begun to run on the date on which the contract had been assigned to Cianbro because it concluded that the assignment had not terminated the contract. Because White Oak had filed its second notice of claim within two years, and its second demand for arbitration within three years, of the date on which the department had issued a certificate of acceptance for the construction of the Tomlinson bridge, the trial court concluded that the second arbitration had been commenced within the limitations period set forth in § 4-61 (b).

by the doctrine of sovereign immunity. Accordingly, we reverse the judgment of the trial court.[7]

Whether § 4-61 waives the state's sovereign immunity with respect to White Oak's claim for delay damages presents us with an issue of statutory interpretation, over which our review is plenary.[8] See *Dept. of Public*

[7] In light of this conclusion, we need not reach the department's claims that the second arbitration is barred by the doctrine of res judicata and the statute of limitations in § 4-61 (b).

[8] White Oak claims that § 4-61 (b) clearly and unequivocally provides that the arbitration panel, rather than the courts, must resolve the arbitrability of disputed claims arising under public works contracts. In support of its claim, White Oak points out that, absent agreement to the contrary, arbitrations conducted pursuant to § 4-61 (b) are governed by the rules of the American Arbitration Association, which provide that the arbitration panel "shall have the power to [rule on its] own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement." American Arbitration Association, Construction Industry Arbitration Rules and Mediation Procedures (2005) rule R-8 (a). We are not persuaded. Section 4-61 (b) provides that, "[a]s *an alternative to the procedure provided in subsection (a) of this section,* any such person, firm or corporation *having a claim under said subsection (a)* may submit a demand for arbitration of such claim or claims for determination . . . ." (Emphasis added.) Thus, the authority to file a demand for arbitration under § 4-61 (b) is contingent upon the existence of a disputed claim or claims for which an action in the Superior Courts properly could be filed under § 4-61 (a). Stated another way, waiver of the state's sovereign immunity under § 4-61 (a) is a condition precedent to the arbitral submission in § 4-61 (b). See *Dept. of Public Works* v. *ECAP Construction Co.*, 250 Conn. 553, 558, 737 A.2d 398 (1999) (trial court improperly declined to enjoin arbitration because contractor's claim did not fall within limited waiver of sovereign immunity in § 4-61 [a]). Accordingly, whether an arbitration is barred by the doctrine of sovereign immunity pursuant to § 4-61 (a) is a matter for the courts, not for the arbitrators, to decide. See *White* v. *Kampner*, 229 Conn. 465, 473, 641 A.2d 1381 (1994) (whether condition precedent to arbitral submission has been satisfied is "one for the courts to determine, not the arbitrator"); *Frager* v. *Pennsylvania General Ins. Co.*, 155 Conn. 270, 277, 231 A.2d 531 (1967) ("We cannot extend the scope of the arbitration agreement beyond the fair import of its terms. Since the question of contact was a condition precedent to arbitrability, it should not, itself, have been adjudged to be arbitrable.").

We recognize that the United States Supreme Court has held that, "procedural questions which grow out of the [parties'] dispute and bear on its final disposition are presumptively *not* for the judge, but for an arbitrator, to decide. . . . So, too, the presumption is that the arbitrator should decide allegation[s] of waiver, delay, or a like defense to arbitrability. . . . Indeed,

*Works* v. *ECAP Construction Co.*, 250 Conn. 553, 558, 737 A.2d 398 (1999). "General Statutes § 1-2z directs us first to consider the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered. . . . When a statute is not plain and unambiguous, we also look for interpretive guidance to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter . . . ." (Internal quotation marks omitted.) *Southern New England Telephone Co.* v. *Cashman*, 283 Conn. 644, 650–51, 931 A.2d 142 (2007).

"Our analysis is more specifically illuminated by the well settled principle that when the state waives sovereign immunity by statute a party attempting to sue under the legislative exception must come clearly within its provisions, because [s]tatutes in derogation of sovereignty should be strictly construed in favor of the state, so that its sovereignty may be upheld and not narrowed or destroyed . . . . Where there is any doubt about

the Revised Uniform Arbitration Act of 2000 . . . seeking to incorporate the holdings of the vast majority of state courts and the law that has developed under the [federal Arbitration Act, 9 U.S.C. § 1 et seq.], states that an arbitrator shall decide whether a condition precedent to arbitrability has been fulfilled . . . i.e., whether prerequisites such as time limits, notice, laches, estoppel, and other conditions precedent to an obligation to arbitrate have been met . . . ." (Citations omitted; emphasis in original; internal quotation marks omitted.) *Howsam* v. *Dean Witter Reynolds, Inc.*, 537 U.S. 79, 84–85, 123 S. Ct. 588, 154 L. Ed. 2d 491 (2002). We need not decide whether the defense of sovereign immunity generally is a procedural question for the arbitrators to decide under the federal Arbitration Act; see 9 U.S.C. § 2; or the state arbitration provision; see General Statutes § 52-408; because, under the circumstances of the present case, the scope of the arbitral submission is not defined by a contractual agreement to arbitrate, but, rather, by a statutory waiver of sovereign immunity.

[the] meaning or intent [of a statute in derogation of sovereign immunity, it is] given the effect which makes the least rather than the most change in sovereign immunity. . . . The state's sovereign right not to be sued may be waived by the legislature, provided clear intention to that effect is disclosed by the use of express terms or by force of a necessary implication." (Internal quotation marks omitted.) *Dept. of Public Works* v. *ECAP Construction Co.*, supra, 250 Conn. 558–59. Thus, a party who seeks to litigate or arbitrate a disputed claim arising under a public works contract bears the burden of proving that the claim fits precisely within the narrowly drawn reach of § 4-61. *DeFonce Construction Corp.* v. *State*, 198 Conn. 185, 188, 501 A.2d 745 (1985).

With these principles in mind, we turn to the language of § 4-61 to determine whether it requires all existing disputed claims arising under a public works contract to be pursued and resolved in a single action or arbitration. Subsection (a) of § 4-61 provides in relevant part that, "[a]ny . . . corporation which has entered into a contract with the state, acting through any of its departments . . . for the design, construction, construction management, repair or alteration of any . . . bridge . . . may, in the event of any disputed claims under such contract . . . bring an action against the state to the superior court for the judicial district of Hartford for the purpose of having such claims determined . . . ." Subsection (b) of § 4-61 provides in relevant part that, "[a]s an alternative to the procedure provided in subsection (a) of this section, any such . . . corporation having a claim under said subsection (a) may submit a demand for arbitration of such claim or claims for determination . . . ."

The department claims that the plain language of § 4-61 requires all disputed claims that have accrued under a public works contract to be asserted against the state in a single action or, alternatively, in a single arbitration.

In support of this claim, the department relies on the following statutory language: "in the event of any disputed *claims* under such contract . . . [a party may] bring *an action*"; (emphasis added) General Statutes § 4-61 (a); or, alternatively, "submit *a demand* for arbitration . . . ." (Emphasis added.) General Statutes § 4-61 (b). Essentially, the department claims that the use of the singular in reference to "*an* action" or "*a* demand for arbitration," combined with the use of the plural in reference to "disputed claims," manifests the legislature's intent to limit the number of actions or arbitrations that may be filed under § 4-61. (Emphasis added.) White Oak responds, however, that § 4-61 plainly does not limit the number of actions or arbitrations that may be asserted against the state and, therefore, permits a party to pursue such claims concurrently or consecutively in separate and distinct actions and/or arbitrations.

To resolve the department's claim, we turn to the principles of statutory construction that guide our review. General Statutes § 1-1 (f) provides that, "[w]ords importing the singular number may extend and be applied to several persons or things, and words importing the plural number may include the singular." As we observed in *Stamford Ridgeway Associates* v. *Board of Representatives*, 214 Conn. 407, 430, 572 A.2d 951 (1990), "because § 1-1 (f) uses the word may it is clearly directory and not mandatory. . . . [S]uch statutory expressions are legislative statements of a general principle of interpretation. . . . The principle does not require that singular and plural word forms have interchangeable effect, and discrete applications are favored except where the contrary intent or reasonable understanding is affirmatively indicated." (Citation omitted; internal quotation marks omitted.) We conclude that it is unclear from the plain language of § 4-61 whether it provides a limited waiver of sovereign immunity that

requires a party to assert all of its existing disputed claims in a single action or arbitration, as the department contends, or whether it provides a blanket waiver of sovereign immunity that permits a party to file an unlimited number of separate actions and/or arbitrations, as White Oak maintains. We therefore conclude that § 4-61 is ambiguous. Accordingly, we turn to extratextual sources of legislative intent to discern the scope of the waiver of sovereign immunity contained therein.

Prior to the enactment of § 4-61, "suits against the state by contractors were not countenanced because of sovereign immunity. Individualized legislative authorization to sue was required to be sought by petition before an action could be brought against the state." *Federal Deposit Ins. Corp.* v. *Peabody, N.E., Inc.*, 239 Conn. 93, 103, 680 A.2d 1321 (1996). In 1957, the legislature enacted § 4-61 "to reduce the number of petitions for permission to sue the state that it received involving suits over state construction contracts. 7 H.R. Proc., Pt. 4, 1957 Sess., p. 1937. *DeFonce Construction Corp.* v. *State*, [supra, 198 Conn. 189]. Another reason for allowing parties who had contracted with the state to sue the state directly without seeking legislative authorization was the hope that affording contractors the right to sue would reduce the costs of construction projects to the state by eliminating the cost of the lengthy legislative authorization process that was often built into state construction contracts. Conn. Joint Standing Committee Hearings, General Law, Pt. 2, 1957 Sess., p. 436, remarks of Representative Merrill S. Dreyfus." (Internal quotation marks omitted.) *Federal Deposit Ins. Corp.* v. *Peabody, N.E., Inc.*, supra, 103–104. Accordingly, § 4-61 was intended to foster competitive bidding for state construction contracts, "which, in turn, would make it more likely that the cost to the state of such projects will be reduced." *Dept. of Public Works* v. *ECAP Construction Co.*, supra, 250 Conn. 560.

In 1986, the legislature amended § 4-61 by adding subsection (b), which provides that a party may file a demand for arbitration with the American Arbitration Association in lieu of filing a complaint in the Superior Court. See Public Acts 1986, No. 86-253. The purpose of this amendment was to provide an alternative forum in which disputed claims arising under public works contracts could be resolved in a simpler, speedier and more efficient manner. See 29 H. Proc., Pt. 13, 1986 Sess., p. 4811, remarks of Representative Elinor Wilber ("We believe that [the amendment] would simplify the process. That it would make the process speedier and that it would reduce probably the number of court cases.").

Notably, the legislative history of § 4-61 is silent with respect to whether the statute implements a singular or a blanket waiver of the state's sovereign immunity. The legislative history does reflect, however, that at the time § 4-61 was enacted, it was the common practice for contractors to accumulate their claims and wait until after the completion of the construction project before seeking legislative permission to sue the state. See Conn. Joint Standing Committee Hearings, General Law, Pt. 2, 1957 Sess., p. 441, testimony of Elwood T. Nettlewood (contractor typically must wait approximately two years for next legislative session *after completion of construction project* to seek permission to sue from legislature); id., p. 442 (fourteen potential future claims against state, which "have not, at the present time, [been submitted because the contractors] *have not completed their jobs*" [emphasis added]); id., testimony of Eaton Clod, p. 444 (Detailing disputed claim concerning adjustment to contract price and noting that "*at the completion of the job*, each side had records [documenting the dispute]. We had permission to sue the [s]tate." [Emphasis added.]). In light of this common practice, there is no indication that the legisla-

ture took into account the situation in which a contractor might file multiple actions against the state to resolve disputed claims arising under a single public works contract.

As we repeatedly have observed, § 4-61 was intended to carve out a narrow and limited exception to sovereign immunity. *Federal Deposit Ins. Corp.* v. *Peabody, N.E., Inc.*, supra, 239 Conn. 103 (legislative history of § 4-61 "reflects the narrow and limited purpose for the exception to sovereign immunity contained in § 4-61 [a], and indicates that impleaders like that in the present appeal were not contemplated"); *DeFonce Construction Corp.* v. *State*, supra, 198 Conn. 189 ("[t]he legislative history [of § 4-61] makes no mention of contracts involving nonstate facilities . . . [and] [i]n the absence of evidence of legislative intent to waive its immunity in cases such as this, we presume that the legislature meant to exclude such contracts from the operation of the statute"), superseded by statute as stated in *Ducci Electrical Contractors, Inc.* v. *Dept. of Transportation*, 28 Conn. App. 175, 177–78, 611 A.2d 891 (1992); *Berger, Lehman Associates, Inc.* v. *State*, 178 Conn. 352, 357, 422 A.2d 268 (1979) (construing term " 'design' " in § 4-61 narrowly and noting that, "[t]here is no expression of legislative intent to the contrary"). The scope of this exception must be construed strictly, and "is not to be extended, modified, repealed or enlarged in its scope by the mechanics of [statutory] construction." (Internal quotation marks omitted.) *Spears* v. *Garcia*, 263 Conn. 22, 28, 818 A.2d 37 (2003). In light of the ambiguous language of the statute, and the dearth of any extratextual evidence indicating an affirmative legislative intent to enact a blanket waiver of sovereign immunity permitting a contractor to file multiple actions against the state, we are constrained to conclude that § 4-61 waives the state's sovereign immunity only with respect to a single action or arbitration wherein all existing disputed

claims arising under a public works contract must be pursued and resolved.[9] See, e.g., id.

Our construction of § 4-61 finds further support in the legislative policies that the statute was designed to implement, namely, increasing the quality of construction in the state while, at the same time, reducing its cost by permitting contractors to sue the state directly to resolve disputed claims arising under public works contracts quickly and efficiently. If we were to construe § 4-61 as a blanket waiver of sovereign immunity that permits a contractor to file multiple actions against the state, the cost to the state of public works contracts effectively would increase while, at the same time, the speed and efficiency with which such claims are resolved effectively would decrease. In light of the spirit and purpose of § 4-61, we cannot conclude that the legislature intended such a result. See *BEC Corp.* v. *Dept. of Environmental Protection,* 256 Conn. 602, 622, 775 A.2d 928 (2001) ("[s]tatutes are to be construed in a manner that will not thwart [their] intended purpose" [internal quotation marks omitted]).

The scope of the waiver of sovereign immunity delineated in § 4-61 should not be confused, however, with the principles of res judicata, also known as claim preclusion, or collateral estoppel, also known as issue preclusion.[10] To assess whether a subsequent action is

---

[9] It is undisputed that White Oak's claim for delay damages fully had accrued prior to the commencement of the first arbitration and, consequently, that White Oak could have arbitrated its claim in that proceeding if it had chosen to do so. Our construction of § 4-61, therefore, is limited to the unique factual and procedural posture of the present case, and we express no opinion as to whether the statute waives the state's sovereign immunity with respect to disputed claims that arise *after* the parties fully have litigated or arbitrated preexisting disputed claims.

[10] "The doctrine of res judicata holds that an existing final judgment rendered upon the merits without fraud or collusion, by a court of competent jurisdiction, is conclusive of causes of action and of facts or issues thereby litigated as to the parties and their privies in all other actions in the same or any other judicial tribunal of concurrent jurisdiction. . . . If the same cause of action is again sued on, the judgment is a bar with respect to any

barred by § 4-61, a reviewing court need not undertake an inquiry into the prior claims that actually had been litigated or arbitrated between the parties, or apply the "transactional test"; *Powell* v. *Infinity Ins. Co.*, 282 Conn. 594, 604, 922 A.2d 1073 (2007); to determine whether the current claims form a part of the same transaction, or series of connected transactions, out of which the prior claims arose.[11] Rather, the court simply must ascertain whether the parties previously had litigated or arbitrated *any* disputed claims arising under the same public works contract at issue in the current proceeding, and whether the current claims had existed at the time of the earlier action. See footnote 9 of this

claims relating to the cause of action which were actually made or which might have been made. . . . Claim preclusion (res judicata) and issue preclusion (collateral estoppel) have been described as related ideas on a continuum. . . . More specifically, collateral estoppel, or issue preclusion . . . prohibits the relitigation of an issue when that issue was actually litigated and necessarily determined in a prior action between the same parties or those in privity with them upon a different claim. . . . An issue is actually litigated if it is properly raised in the pleadings or otherwise, submitted for determination, and in fact determined. . . . An issue is necessarily determined if, in the absence of a determination of the issue, the judgment could not have been validly rendered." (Citations omitted; internal quotation marks omitted.) *Powell* v. *Infinity Ins. Co.*, 282 Conn. 594, 600–601, 922 A.2d 1073 (2007).

[11] See, e.g., *Powell* v. *Infinity Ins. Co.*, supra, 282 Conn. 604 ("We have adopted a transactional test as a guide to determining whether an action involves the same claim as an earlier action so as to trigger operation of the doctrine of res judicata. [T]he claim [that is] extinguished [by the judgment in the first action] includes all rights of the plaintiff to remedies against the defendant with respect to all or any part of the transaction, or series of connected transactions, out of which the action arose. What factual grouping constitutes a transaction, and what groupings constitute a series, are to be determined pragmatically, giving weight to such considerations as whether the facts are related in time, space, origin, or motivation, whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectations or business understanding or usage. . . . In applying the transactional test, we compare the complaint in the second action with the pleadings and the judgment in the earlier action." [Citations omitted; internal quotation marks omitted.]).

opinion. If so, then the current claims are barred by the doctrine of sovereign immunity.

With this background in mind, we turn to the facts of the present case. It is undisputed that White Oak's claim for delay damages fully had accrued prior to the commencement of the first arbitration and, consequently, that White Oak could have arbitrated its claim in that proceeding if it had chosen to do so. Our thorough review of the record reveals, however, that the sole claim arbitrated by White Oak in the first arbitration was a claim for wrongful termination.[12] Throughout the hearings in the first arbitration, White Oak repeat-

---

[12] In an action for wrongful termination, a contractor must establish that an implied or express contract existed, and that the contract wrongfully had been terminated by virtue of the owner's material breach. See, e.g., *Valente* v. *Weinberg*, 80 Conn. 134, 135, 67 A. 369 (1907) ("[i]f the plaintiff, without fault on his part, was prevented by the defendant from completing the contract, he could treat it as rescinded and recover, quantum meruit, for the work and labor performed under it, or he could bring his action for damages against the defendant for breaking the contract and preventing the plaintiff's performance of it"). "Wrongful termination gives the wrongfully terminated party: (1) the right to acquiesce to the termination by rescinding the contract and to recover upon quantum meruit for its performance to date; (2) the right to keep the contract in force, be prepared to perform and seek damages plus the contract price; or (3) the right to treat the breach as terminating the contract and to sue for profits it would have realized from performing." 2 S. Stein, Construction Law (2007) § 4.15 [5], pp. 4-152 through 4-153; see also *United States* v. *Behan*, 110 U.S. 338, 344–45, 4 S. Ct. 81, 28 L. Ed. 168 (1884); *Ambrogio* v. *Beaver Road Associates*, 267 Conn. 148, 159, 836 A.2d 1183 (2003); *Maguire* v. *Kiesel*, 86 Conn. 453, 460–61, 85 A. 689 (1913); *Valente* v. *Weinberg*, supra, 135.

By contrast, in an action for delay damages, the contractor need not establish that the contract had been terminated, but must establish that the owner had caused certain inexcusable delays in the completion of the construction project. See 2 S. Stein, supra, § 6.11 [1] [a], pp. 6-53 through 6-54; see also *P.R. Burke Corp.* v. *United States*, 277 F.3d 1346, 1360 (Fed. Cir. 2002) ("contractors can recover delay damages against the government only if there is government-caused delay and it was unnecessary or unreasonable in duration"). "[A]n examination of planned cost versus actual cost is at the heart of the damage computation" for a delay claim. 2 S. Stein, supra, § 6.04, pp. 6-10 through 6-11. Damages may include, but are not limited to, excess payroll expenses and equipment costs caused by the owner's inexcusable delay. Id.

edly characterized its claim as one for wrongful termination.[13] Additionally, in its posthearing brief, White Oak

---

[13] As the first arbitration panel noted in its findings of facts, decision and award, the breadth of White Oak's demand for arbitration "raised the question as to whether White Oak was maintaining a claim or claims other than a claim for damages arising out of wrongful termination, despite the limitations of § 4-61. Any uncertainty on this point was conclusively eliminated in the view of the [p]anel on numerous occasions during these proceedings by the positions taken and representations made by White Oak in this arbitration and in the related court proceedings.

"First, in its November 5, 2001 ruling on jurisdiction questions, the [p]anel noted that [the department] argued that the [r]evised [a]mended [d]emand did not adequately put [the department] on notice of the facts and circumstances underlying all of the delay and disruption claims that White Oak asserted. White Oak, in turn, defended the motion on the basis that it was not advancing discrete claims; it was advancing only a claim for damages due to wrongful termination, a wrongful termination claim that had as support the various denominated breaches set forth in the [r]evised [a]mended [d]emand. It has long been established under Connecticut law, that in order for an owner to validly exercise his right to terminate a construction contract, he must be 'without fault under the contract' and otherwise strictly comply with the terms of the termination provision that he seeks to invoke. See [*Edward DeV. Tompkins, Inc.* v. *Bridgeport*, 94 Conn. 659, 679, 110 A. 183 (1920)]; *Valente* v. *Weinberg*, [80 Conn. 134, 138, 67 A. 369 (1907)]. Thus, according to White Oak, the individual breaches and delays alleged in its [r]evised [a]mended [d]emand did not represent multiple individual claims, but instead were alleged in order to support a single overarching wrongful termination claim. The [p]anel accepted White Oak's argument and ruled in its favor. At the time, the [p]anel noted that the [r]evised [a]mended [d]emand 'states primarily a claim for wrongful termination.' . . .

"After that ruling, White Oak repeatedly acknowledged that it was pursuing a claim of wrongful termination and nothing else. For example, White Oak's counsel . . . stated in an October 29, 2002 hearing in [the] Superior Court, 'But the cause of action is solely wrongful termination.' . . . In response to Judge Sheldon's inquiry, 'Are you making a claim that your demand in this—for arbitration in this case raises anything other than a termination claim?', [White Oak's counsel] replied, 'No. Only damages that flow from the termination. So it's all based on the termination.' . . . At that same hearing, [White Oak's counsel] noted to the court, 'I think you're quite right, we have brought a wrongful termination claim, I think we have to live and die by it at this point.' . . .

"The tenor of the admissions made in [the] Superior Court is repeated again and again in this arbitration. White Oak's counsel . . . stated in a December 3, 2003 letter to this [p]anel that '[the department's counsel] states that White Oak is asserting [thirty] different claims. This is not so. There is but one claim and that is for wrongful termination of the contract.' . . . That White Oak is pursuing a single claim of wrongful termination was confirmed at other points in filings with the [p]anel and during the arbitration hearings." (Citations omitted.)

represented to the arbitration panel that there were only two issues to be decided: (1) "whether the termination was justified"; and (2) "calculation of damages to the aggrieved party." Although White Oak presented extensive evidence of delays,[14] our review of the record reveals that this evidence was submitted to support White Oak's claim that the department's alleged termination of the contract was unjustified and wrongful, and to establish the reasonable value of the work performed under the contract as an element of damages.[15] See footnotes 12 and 13 of this opinion. Because § 4-61 waives the state's sovereign immunity only with respect to a single action or arbitration wherein all existing disputed claims must be pursued and resolved, and because White Oak's claim for delay damages existed at the time of the first arbitration but was not pursued in that proceeding, we conclude that it is barred by the doctrine of sovereign immunity.

[14] For example, White Oak's expert witness with respect to scheduling, William Albert Manginelli, the president of Trauner Consulting Services, testified for approximately three days with respect to the significant delays that White Oak experienced in completing construction of the Tomlinson bridge and the manner in which these delays were attributable to the acts or omissions of the department. Additionally, White Oak adduced testimony from various witnesses concerning alleged design deficiencies, incomplete plans and specifications, differing site conditions and unexpected obstructions, all of which allegedly delayed the timely completion of the Tomlinson bridge through no fault of White Oak.

[15] For example, the record indicates that during the first arbitration, counsel for White Oak stated: "this is a termination case, and the basis for [White Oak's alleged] termination was [its] failure to timely complete the project." Counsel for the department stated: "[a]s I understand White Oak's claim, they're claiming that the state did certain things wrong which delayed the job, and then they were eventually . . . terminated because it was the state's fault; it was a wrongful termination." White Oak further indicated in its posthearing brief that, "[a]s a result of these delays, which are documented by the evidence presented during this arbitration, it is clear that [White Oak] was not responsible for the delays and that the termination of [White Oak] was improper," and that "the proper measure of damages where there has been an improper termination of a contract by an owner is the reasonable value of the work performed by the contractor to the time of termination less the amounts paid by the owner. . . . Costs increase as a

White Oak asserts, however, that the trial court found that its claim for delay damages had been set aside or bifurcated in the first arbitration and, therefore, was not barred by the limited waiver of sovereign immunity in § 4-61.[16] After thoroughly reviewing the transcripts of the forty-two days of hearings conducted before the first arbitration panel, and the parties' lengthy posttrial and reply briefs in that proceeding, we conclude that the trial court's factual finding is unsupported by the record. See *Lydall, Inc.* v. *Ruschmeyer*, 282 Conn. 209, 221, 919 A.2d 421 (2007) ("A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. . . . In making this determination, every reasonable presumption must be given in

project is delayed. In addition, the testimony has shown the disruptive manner in which [the department] forced [White Oak] to work. The delays, disruptions, changes, etc. all increase the cost of the work."

[16] White Oak also appears to argue that the issue of damages had been set aside or bifurcated in the first arbitration and, consequently, that it should be permitted to pursue a second arbitration to establish the amount of damages to which it is entitled in light of the arbitration panel's factual finding that it had suffered certain delays for which the department should have granted an extension of time under the contract. This claim has no merit. The sole claim presented by White Oak in the first arbitration was a claim for wrongful termination, which the arbitration panel rejected. The panel specifically stated: "With the [p]anel's findings that [the department] did not terminate the [c]ontract or call the bond, White Oak's claim of wrongful termination fails as a matter of law. . . . Proof of a termination is a necessary element of the cause of action prosecuted by White Oak. Failure to prove a necessary element of a cause of action requires a denial of White Oak's claim in its entirety. Even though the [p]anel finds that [the department] should have granted additional time extensions to White Oak, White Oak has failed to articulate and maintain a delay claim under which the [p]anel could have awarded damages to White Oak." Accordingly, White Oak is not entitled to recover damages. See, e.g., *Zommer* v. *Ventulett*, 170 Conn. 490, 493, 365 A.2d 1059 (1976) ("in the absence of liability no damages [can] be awarded"); see also footnote 12 of this opinion (explaining distinction between elements of, and damages recoverable for, wrongful termination and delay damages claims).

favor of the trial court's ruling." [Internal quotation marks omitted.]). Simply stated, there is no evidence in the record to indicate that White Oak had articulated a claim for delay damages in the first arbitration, and that that claim subsequently had been set aside or bifurcated. See footnote 13 of this opinion. Accordingly, we conclude that the trial court's factual finding is clearly erroneous.

The judgment is reversed and the case is remanded to the trial court with direction to render judgment in favor of the department on its claim for a permanent injunction.

In this opinion the other justices concurred.