THERESA SOKAITIS *v.* ROSE BAKAYSA
(SC 18130)

Norcott, Katz, Palmer, Zarella and Quinn, Js.

18

Argued April 28—officially released August 11, 2009

*William J. Sweeney, Jr.,* for the appellant (defendant).

*Samuel M. Pollack,* pro hac vice, with whom was *Sean R. Higgins,* for the appellee (plaintiff).

*Opinion*

ZARELLA, J. The dispositive issue in this certified[1] appeal is whether General Statutes § 52-553[2] applies to,

---

[1] We granted the defendant's petition for certification to appeal limited to the following issue: "Did the Appellate Court properly conclude that the parties' contract was not unenforceable under General Statutes § 52-553?" *Sokaitis* v. *Bakaysa,* 286 Conn. 913, 945 A.2d 946 (2008).

[2] General Statutes § 52-553 provides: "All wagers, and all contracts and securities of which the whole or any part of the consideration is money or

and makes void, a contract entered into by the plaintiff, Theresa Sokaitis, and the defendant, Rose Bakaysa, to share equally the proceeds of their legal gambling activities. On appeal, the defendant challenges the Appellate Court's determination that the contract between the parties was not covered by § 52-553. We affirm the judgment of the Appellate Court.

The following undisputed factual and procedural history, as set forth in the Appellate Court's opinion, are relevant to our disposition of this appeal. "On April 12, 1995, the plaintiff and the defendant, who are sisters, created and signed a written agreement. The agreement stated: 'This is a letter of agreement between [the defendant] and [the plaintiff]. This letter is dated on 4/12/95. This letter states that we are partners in any winning we shall receive, to be shared [equally]. (Such as slot machines, cards, at Foxwoods Casino, and [lottery] tickets, etc.).' On June 20, 2005, a winning Powerball lottery ticket, worth $500,000, from the June 18, 2005 drawing was presented to the Connecticut lottery officials for payout. The winning ticket was presented by Joseph F. Troy, Sr., the brother of the parties, who indicated that he held the ticket jointly with the defendant. Lottery officials paid Troy and the defendant each $249,999, less federal tax withholding. The defendant did not provide the plaintiff with any portion of the lottery winnings.

"As a result, on August 19, 2005, the plaintiff brought an action against the defendant for breach of contract.

other valuable thing won, laid or bet, at any game, horse race, sport or pastime, and all contracts to repay any money knowingly lent at the time and place of such game, race, sport or pastime, to any person so gaming, betting or wagering, or to repay any money lent to any person who, at such time and place, so pays, bets or wagers, shall be void, provided nothing in this section shall (1) affect the validity of any negotiable instrument held by any person who acquired the same for value and in good faith without notice of illegality in the consideration, or (2) apply to the sale of a raffle ticket pursuant to section 7-172."

The plaintiff sought money damages equal to [one-half] of the defendant's Powerball winnings plus interest. On August 17, 2006, the defendant filed a motion for summary judgment, alleging that there was no genuine issue of material fact and that the agreement on which the plaintiff was suing was unenforceable under § 52-553, thereby entitling the defendant to judgment as a matter of law. On September 14, 2006, the court granted the defendant's motion for summary judgment and rendered judgment in the defendant's favor." *Sokaitis* v. *Bakaysa*, 105 Conn. App. 663, 664–65, 938 A.2d 1278 (2008).

The plaintiff appealed to the Appellate Court, which reversed the trial court's judgment, concluding that § 52-553 is not applicable to the parties' agreement because the agreement was not a wagering contract within the terms of the statute. Id., 666. The Appellate Court reached this conclusion by examining the contract and determining that "the plaintiff and the defendant promised to share equally in any winnings they received from various forms of legalized gambling, including the lottery. They did not make promises that were induced by the consideration of 'money . . . won . . . at any game [pursuant to § 52-553] . . . .' Therefore, the consideration for the agreement was not the money that they won but rather their mutual promises to one another to share in any winnings they received." Id., 667. This certified appeal followed.

On appeal to this court, the defendant claims that the Appellate Court improperly determined that the parties' contract was not within the proscriptive reach of § 52-553. She asserts that the Appellate Court mischaracterized the consideration supporting the contract which, she claims, was indeed "money . . . won . . . at any game . . . ." General Statutes § 52-553. The plaintiff, on the other hand, urges this court to uphold the judgment of the Appellate Court, arguing that the

Appellate Court's determination that the parties' contract was not a wagering contract as defined by § 52-553 was correct.

The plaintiff also offers two closely related alternative grounds for affirmance should this court conclude that the parties' contract was indeed a wagering contract. First, the plaintiff argues that § 52-553 simply is not applicable to wagering contracts involving legal forms of gambling because such activities do not run afoul of this state's public policy against gambling. Second, the plaintiff argues that the statute is inapplicable to the contract at issue because § 52-553 has been implicitly repealed by subsequent legislation legalizing various forms of gambling to the extent that it may not be applied to void agreements to share winnings from legal forms of gambling. The plaintiff asserts that any other interpretation of § 52-553 would make it irreconcilable with the legislature's decision to alter public policy and to enact statutes legalizing certain forms of gambling. We agree with the plaintiff that the parties' agreement is not governed by § 52-553 and affirm the judgment of the Appellate Court, albeit on different grounds.[3]

We begin by setting forth the appropriate standard of review. Because the present case was disposed of by way of summary judgment, we first address the appropriate framework for appellate review of a summary judgment determination. "Practice Book § 17-49 provides that summary judgment shall be rendered forthwith if the pleadings, affidavits and any other proof

---

[3] In our view, the Appellate Court's approach to resolving this issue is inconsistent with this court's opinion in *Ciampittiello* v. *Campitello*, 134 Conn. 51, 54 A.2d 669 (1947), a case we distinguish subsequently in this opinion. Our analysis, therefore, focuses on the plaintiff's first alternative ground for affirmance, as we believe that deciding this case on that basis avoids the need to consider overruling *Ciampittiello*, something that neither of the parties has asked us to do.

submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. In deciding a motion for summary judgment, the trial court must view the evidence in the light most favorable to the nonmoving party. . . . The party moving for summary judgment has the burden of showing the absence of any genuine issue of material fact and that the party is, therefore, entitled to judgment as a matter of law. . . . On appeal, we must determine whether the legal conclusions reached by the trial court are legally and logically correct and whether they find support in the facts set out in the memorandum of decision of the trial court. . . . Our review of the trial court's decision to grant the defendant's motion for summary judgment is plenary." (Internal quotation marks omitted.) *Bellemare* v. *Wachovia Mortgage Corp.*, 284 Conn. 193, 198–99, 931 A.2d 916 (2007).

In addition, the resolution of this appeal involves an interpretation of § 52-553, a question over which we exercise plenary review. See, e.g., *Dept. of Transportation* v. *White Oak Corp.*, 287 Conn. 1, 7, 946 A.2d 1219 (2008). "The principles that govern statutory construction are well established. When construing a statute, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case, including the question of whether the language actually does apply. . . . In seeking to determine that meaning, General Statutes § 1-2z directs us first to consider the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be

considered. . . . When a statute is not plain and unambiguous, we also look for interpretive guidance to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter . . . ." (Internal quotation marks omitted.) *Friezo* v. *Friezo*, 281 Conn. 166, 181–82, 914 A.2d 533 (2007).

The principle of legislative consistency is vital to our consideration of the subject statute's "relationship to existing legislation . . . governing the same subject matter . . . ." Id., 182. "[T]he legislature is always presumed to have created a harmonious and consistent body of law . . . . [T]his tenet of statutory construction . . . requires [this court] to read statutes together when they relate to the same subject matter . . . . Accordingly, [i]n determining the meaning of a statute . . . we look not only at the provision at issue, but also to the broader statutory scheme to ensure the coherency of our construction. . . . [T]he General Assembly is always presumed to know all the existing statutes and the effect that its action or [nonaction] will have upon any one of them." (Internal quotation marks omitted.) *Stone-Krete Construction, Inc.* v. *Eder*, 280 Conn. 672, 678, 911 A.2d 300 (2006). Thus, in considering whether § 52-553 is applicable to the parties' contract in the present case, we are bound to consider the existence of other statutes and regulations concerning gambling in order to ensure that our construction of the statute makes sense within the overall legislative scheme.

With these principles in mind, we turn to an examination of the statute at issue. In accordance with the mandate of § 1-2z that we consider the relationship of § 52-553 to other statutes in discerning its meaning, we note that a literal reading of the statute results in several

conflicts with other, more recent, statutes related to legal wagering. The statute first declares that "[a]ll wagers . . . shall be void . . . ." General Statutes § 52-553. Clearly, this cannot be the absolute law of a state that has authorized the operation of a lottery; see General Statutes §§ 12-800 through 12-818; the establishment of off-track betting facilities; see General Statutes § 12-571a; pari-mutuel betting at licensed events; see General Statutes § 12-575; and the operation of jai alai frontons; see General Statutes § 12-573a. See generally *Hilton International Co.* v. *Arace,* 35 Conn. Sup. 522, 527–28, 394 A.2d 739 (1977) (Appellate Session of Superior Court explaining that authorization of various forms of legalized gambling has "attenuated" and "ero[ded]" public policy against gambling). Moreover, the legislature has entered into tribal-state compacts with the Mashantucket Pequot Tribal Nation and the Mohegan Tribe of Indians of Connecticut to administer the operation of casinos on tribal lands at which many forms of gambling occur. See General Statutes §§ 12-586f and 12-586g. It is beyond peradventure that the laws of the state of Connecticut permit many forms of wagering. Thus, it cannot be that § 52-553 truly prohibits or makes unenforceable "[a]ll wagers," as such a reading of the statute is irreconcilable with this state's various forms of legalized wagering.[4] Thus, at least with

---

[4] In a 2003 amendment to § 52-553, the legislature found it necessary to exempt explicitly "the sale of a raffle ticket pursuant to [§] 7-172" from the operation of § 52-553. Public Acts 2003, No. 03-60, § 2. The legislative history clearly indicates that the purpose of this exemption was to allow the purchase of raffle tickets with a credit card, a form of wagering on credit. The remarks of Senator David J. Cappiello in support of the amendment make this clear: "As many of you already know, Connecticut is one of the only states that does not allow the use of a credit card to purchase raffle tickets. . . . [T]hey can go to the casinos and gamble with their credit cards, but for some reason, they cannot use them because of an antiquated 1940s law to purchase raffle tickets. . . . I urge you to please pass this law." Conn. Joint Standing Committee Hearings, Public Safety, Pt. 1, 2003 Sess., pp. 10–11. Senator Ernest E. Newton's remarks on the floor of the Senate are similarly illuminating: "Basically what this bill does, it allows organizations, nonprofits, an opportunity to use credit cards to [sell] raffle tickets and the

respect to the act of wagering, § 52-553 can only be read sensibly to include the implicit caveat "except as otherwise provided by law."[5]

The second provision of the statute proves to be equally inconsistent with the legalized wagering provisions, without the implicit caveat "except as otherwise provided by law." In addition to prohibiting "[a]ll wagers," § 52-553 also makes void "all contracts . . . of which the whole or any part of the consideration is money . . . won, laid or bet, at any game, horse race, sport or pastime . . . ." Read literally, this portion of the statute would prevent many forms of legal wagering, which involve an express or implied contract under which the consideration is "money . . . bet," such as pari-mutuel wagering, casino gaming and even the lottery. Although perhaps not often stated explicitly, every

nonprofit organizations really need this tool to help them in their fundraising efforts." 46 S. Proc., Pt. 6, 2003 Sess., p. 1886. Representative Stephen D. Dargan expressed the same understanding in the House of Representatives: "[B]asically what this bill will do, it will permit nonprofits to [sell] raffle tickets with a debit or credit card . . . ." 46 H.R. Proc., Pt. 10, 2003 Sess., p. 3148. This legislative commentary bolsters our interpretation of § 52-553 as allowing wagering contracts, even those made on credit under certain circumstances, when the underlying gambling activity itself is legal. We surmise that the legislature has not substantively overhauled § 52-553 because, despite its erosion in recent years, the public policy and positive laws of this state remain opposed to all forms of unregulated gambling; see, e.g., General Statutes § 53-278b (criminalizing gambling generally); and making contracts facilitating illegal gambling unenforceable is both consistent with and supportive of this policy.

[5] In reality, this is merely another way of saying that the more specific and recent statutes authorizing certain forms of wagering represent a partial, implicit repeal of the inconsistent aspects of § 52-553. "So far as pre-existing [statutory] provisions, by their repugnancy or inconsistency, stand in the way of the full and effective operation of the final expressed will of the legislature, they stand, in law, as pro tanto repealed. Not only is this true of those provisions which are on their face inconsistent with the [more recent statutes], but of any others which upon examination and analysis are found to hamper or interfere with its workability." *Connelly* v. *Bridgeport*, 104 Conn. 238, 253, 132 A. 690 (1926). Thus, to the extent that § 52-553 is inconsistent or interferes with the various statutes authorizing gambling, we conclude that it implicitly has been repealed.

legal wager is, in essence, a gambling contract.[6] For example, the purchase of a lottery ticket represents a contract between the purchaser and the state lottery corporation, pursuant to which the purchaser wagers the purchase price of the ticket in exchange for a promise that, should a particular set of numbers be chosen, he will win a specified prize. See *Talley* v. *Mathis*, 265 Ga. 179, 453 S.E.2d 704 (1995) (lottery is gambling contract between state and player). The parties to the gambling contract have agreed to "engage in a gamble"; Black's Law Dictionary (9th Ed. 2009); the consideration for which, on the bettor's side, is "money . . . bet . . . ." General Statutes § 52-553; see footnote 6 of this opinion. If such a contract were to be deemed unenforceable under the broad language of § 52-553, we presume that the Connecticut Lottery Corporation would quickly find itself bereft of clientele. We must infer, therefore, in the course of construing this statute within the broader context of those statutes authorizing various forms of legalized gambling, that the legislature intended to exempt from the operation of § 52-553 those contracts supported by consideration in the form of money won or bet in the course of *legal* gambling.[7]

[6] Black's Law Dictionary defines a gambling contract as "[a]n agreement to engage in a gamble; a contract in which two parties wager something, esp. money, for a chance to win a prize. Where gambling is legal, contracts related to legal gambling activities are enforceable." Black's Law Dictionary (9th Ed. 2009); see also *Hardin* v. *NBC Universal, Inc.*, 283 Ga. 477, 479, 660 S.E.2d 374 (2008) (A gambling contract is "one in which the parties in effect stipulate that they shall gain or lose upon the happening of an . . . event in which they have no interest except that arising from the possibility of such gain or loss. . . . By the terms of such a contract the consideration must fall to the one or the other upon the determination of the specified event." [Internal quotation marks omitted.]).

[7] We note, as the Appellate Court did, that there exists serious doubt as to whether the parties' agreement in this case constitutes a gambling contract within the common definition of that term. See footnote 6 of this opinion. We need not reach this issue, however, because we conclude that § 52-553 does not apply to the agreement in question in any case.

Indeed, an examination of General Statutes §§ 53-278a and 53-278b, the statutes defining and criminalizing " '[g]ambling,' " respectively, strongly supports our understanding of § 52-553. Section 53-278a (2) defines " '[g]ambling,' " in relevant part, as "risking any . . . thing of value for gain contingent in whole or in part upon lot, chance or the operation of a gambling device, including the playing of a casino gambling game such as blackjack, poker, craps, roulette or a slot machine, but *does not include . . . other acts or transactions expressly authorized by law* on or after October 1, 1973 . . . ." (Emphasis added.) Section 53-278b makes engaging in gambling a class B misdemeanor.[8] When reading § 53-278b together with § 52-553, it is clear that, in combination, these statutes are intended both to criminalize gambling not otherwise authorized by law, and to deter illicit gambling by rendering all contracts facilitating such activities void and unenforceable. It stands to reason, therefore, that the legislature intended § 52-553 to be construed consistently with §§ 53-278a and 53-278b and to be applied only to contracts related to *illegal* gambling. Reading these related statutes in this manner is not only consistent with the mandate of § 1-2z but also serves to explain the continued existence and usefulness of § 52-553 in an age of pervasive legalized gambling.

Finally, § 52-553 provides in relevant part: "[A]ll contracts to repay any money knowingly lent at the time and place of such game, race, sport or pastime, to any person so gaming, betting or wagering, or to repay any money lent to any person who, at such time and place, so pays, bets or wagers, shall be void . . . ." This provision prohibits the enforcement of contracts facilitating

---

[8] General Statutes § 53-278b provides in relevant part: "(a) Any person who engages in gambling, or solicits or induces another to engage in gambling, or is present when another person or persons are engaged in gambling, shall be guilty of a class B misdemeanor . . . ."

any type of gambling on credit, and largely has remained untouched by the legislature's "substantial inroads into the public policy against gambling"; *Casanova Club* v. *Bisharat*, 189 Conn. 591, 598, 458 A.2d 1 (1983); represented by its sanctioning of certain forms of legalized gambling. Indeed, this court has recognized that "[n]one of these statutes . . . permits gambling on credit, and that is the vice at which the underlying statutes forbidding wagering contracts; General Statutes §§ 52-553 and 52-554; are particularly directed." Id. Even this core provision is not absolutely sacrosanct, however, as the legislature specifically has authorized a form of gambling on credit by permitting the use of credit cards to purchase raffle tickets under § 52-553. See footnote 4 of this opinion. Thus, even this part of the statute must be read to include an implicit caveat in order to remain consistent with the other legalized gambling statutes.

It is noteworthy that both the Connecticut Lottery Corporation and the state tax laws explicitly recognize that lottery winnings may be shared by agreement, and provide guidelines and forms regulating and taxing such shared winnings.[9] Indeed, the defendant and her brother completed federal Form 5754 in the present case, indicating that they were entitled to equal shares of the lottery winnings. It certainly would be extraordinary

---

[9] Section 12-705(b)-2 (e) (2) of the Regulations of Connecticut State Agencies provides: "If more than one individual is entitled to a share of the gambling winnings, one federal Form 5754 (Statement by a Person(s) Receiving Gambling Winnings) shall be completed, identifying each of the persons entitled to a share. Form 5754 is also used when the recipient is an individual not entitled to a share. This Form lists the name, address, and taxpayer identification number of all individuals entitled to any share of the winnings. In the event the identity or residence of any individual entitled to share in the winnings cannot be satisfactorily established by the individual receiving the winnings, the share of the winnings to which such individual is entitled shall be considered to have been won by a resident of Connecticut and the income tax shall be withheld. The Form shall be signed, under penalties of perjury, by the individual(s) receiving the winnings."

for the legislature to permit the existence of regulations that facilitate the sharing of lottery winnings if private agreements to divide such winnings were barred by § 52-553. We are persuaded that the legislature intended no such conflict, and we are bound to interpret § 52-553 so as to avoid it if reasonably possible. See *Stone-Krete Construction, Inc.* v. *Eder*, supra, 280 Conn. 678.

Construing the statute in light of the foregoing, we conclude that the parties' agreement in the present case, even if it is a wagering contract, is not governed by § 52-553. The defendant has not offered an alternative interpretation of § 52-553 that would make it consistent with the legislature's policy of permitting some forms of regulated gambling. Nevertheless, the defendant asserts that this court's decision in *Ciampittiello* v. *Campitello*, 134 Conn. 51, 54 A.2d 669 (1947), supports her position that the purported contract with the plaintiff is "void in Connecticut as pernicious and contravening Connecticut's deep-rooted public policy opposing gambling contracts." We believe *Ciampittiello* is distinguishable and that the defendant's reliance on the case, therefore, is misplaced.

The contract at issue in *Ciampittiello* was an agreement between two brothers to share equally in any proceeds or losses incurred as a result of pari-mutuel betting conducted by the parties on horse races over the course of several days. Id., 53. The agreement was made, and the wagering conducted, in Rhode Island, where wagering on horse races was legal. Id., 53–54. The reasoning this court employed in determining that the contract was valid in Rhode Island is instructive: "The agreement to share the proceeds of the gaming was a legal contract where it was made. Pari-mutuel betting on horse races is lawful in Rhode Island . . . ." Id., 54. This statement suggests that the brothers' agreement to share their winnings was valid, at least in part, because the underlying wagering was legal. This

surmise is further supported by the court's subsequent statement: "The defendant does not claim that such wagering is lawful in Connecticut but contends that our public policy does not prevent the enforcement of the claim by our courts." Id. Again, this statement suggests, at least implicitly, that the court's conflict of laws analysis hinged primarily on the legality of the underlying gambling activity, giving the distinct impression that, had the wagering been legal in Connecticut, the court would have been inclined to enforce the foreign contract.

Our reading of *Ciampittiello* also is buttressed by the fact that, when the decision was released in 1947, there was no legalized gambling in this state.[10] Furthermore, not only had "[r]epeated efforts to legalize parimutuel betting in [Connecticut] . . . failed"; id., 55; but betting on horse racing was actually a crime under General Statutes (1930 Rev.) § 6316. Id. This court went so far as to declare that "[s]ince the establishment of our government wagering has been held to be, if not absolutely immoral, yet so injurious in its results as to require suppression by penal legislation." (Internal quotation marks omitted.) Id., 56. Thus, in *Ciampittiello*, we relied on this state's "ancient and deep-rooted public policy" against all forms of gambling; id., 57; and held that the parties' agreement to share their winnings was unenforceable in Connecticut because enforcing it "would violate some fundamental principle of justice, some prevalent conception of good morals, some deeprooted tradition of commonweal." (Internal quotation marks omitted.) Id.

Manifestly, the public policy of this state with respect to gambling, as reflected in subsequent revisions of

[10] See, e.g., General Statutes (1930 Rev.) § 6316 (betting on horse racing prohibited); General Statutes (1930 Rev.) § 6318 (gaming in general prohibited); General Statutes (1930 Rev.) § 6324 (use of billiard table or slot machine for gaming purposes prohibited); General Statutes (1930 Rev.) § 6332 (lotteries prohibited).

the General Statutes, has evolved considerably since *Ciampittiello* was decided. Our legislature has deemed it appropriate to legalize wagering in multiple forms and forums, to the extent that the "ancient and deep-rooted" public policy against gambling; id.; while still cognizable in some respects, is but a dusty relic of its former self. See *Hilton International Co.* v. *Arace*, supra, 35 Conn. Sup. 527–28. We believe that, if *Ciampittiello* were to be decided today, the court would find the contract enforceable because it would, in fact, be legal in this state and there would be no conflict with the laws of the jurisdiction where the contract was made. By the same reasoning, we conclude that the parties' contract in the present case is not unenforceable under § 52-553. It would be, in our view, contrary to the statutory scheme as a whole to conclude that an agreement to share the spoils of legal wagering is illegal and unenforceable.[11]

The judgment of the Appellate Court is affirmed.

In this opinion the other justices concurred.

[11] We express no opinion, however, as to the enforceability of the parties' agreement pursuant to the principles of the law of contracts. That is a determination left to the trial court after the facts of the case have been fully developed.