******************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.
******************************************

ROBINSON, C. J., with whom PALMER and MUL-LINS, Js., join, concurring in part and dissenting in part. A variety of mental health, domestic violence, and parenting issues has necessitated the involvement of the Department of Children and Families (department) with the families of the respondents, Gary O. (father) and Cassandra D. (mother),[1] since their own childhoods. When the respondents became parents themselves, those continued difficulties resulted in the department's successfully petitioning to terminate their parental rights to their two older children, first G and later J. While the neglect and termination proceedings were pending as to J, and the mother was pregnant with the minor child, Teagan K.-O., the respondents paid a relative to drive them to Florida in order to start a new life there and to evade the department's anticipated removal of Teagan upon her birth. Their plans, however, were foiled when a Florida child welfare agency took custody of Teagan upon her birth, and a Florida court exercised its jurisdiction under certain court rules implementing Florida's version of the Uniform Child Custody Jurisdiction and Enforcement Act (UCCJEA) and deemed Connecticut's courts a more appropriate forum for proceedings concerning Teagan's welfare, given the then pending proceedings in Connecticut concerning J. Our trial court assented to the Florida decision when it agreed to assume jurisdiction over the predictive neglect[2] petition brought by the petitioner, the Commissioner of Children and Families.

I respectfully disagree with part II of the majority opinion, in which the majority concludes that the trial court lacks subject matter jurisdiction over this case as a result of our state's statutes governing the Superior Court's jurisdiction over juvenile matters, in particular General Statutes §§ 46b-1 (11) and 46b-121 (a) (1), which, together, give our Superior Court "jurisdiction" over "proceedings concerning uncared-for, neglected or abused children *within this state* . . . ."[3] (Emphasis added.) General Statutes § 46b-121 (a) (1). The majority rejects the petitioner's reliance on Connecticut's version of the UCCJEA, General Statutes § 46b-115 et seq., and holds that "the failure to satisfy § 46b-121 prevents Connecticut from exercising jurisdiction over the neglect petition, irrespective of whether the conditions for exercising jurisdiction under the UCCJEA would be met." Specifically, the majority concludes that, "[b]ecause the UCCJEA does not confer subject matter jurisdiction on our courts but instead determines whether our courts may exercise existing jurisdiction or must defer to another state's jurisdiction, it provides no impediment to statutes, like § 46b-121, that determine the scope of jurisdiction." In my view, the majority's interpretation of our statutes is inconsistent with the text of the rele-

vant statutes, when read in context, and frustrates the purposes of the UCCJEA, which include avoiding inter-jurisdictional conflict and ensuring that child custody cases are heard in the forum best situated to decide the case. Instead, I conclude that, under subdivision (17) of § 46b-1, the UCCJEA, specifically General Statutes § 46b-115k,[4] provides an independent and coordinate basis for our Superior Court's subject matter jurisdiction in the specific instance of child custody and neglect cases of interstate dimension, regardless of the child's presence in Connecticut. This is consistent with § 46b-121 (a) (1), which merely describes our Superior Court's territorial jurisdiction over juvenile cases. I further conclude that Connecticut's courts have jurisdiction over Teagan under the "substantial connection" provisions of the UCCJEA. See General Statutes § 46b-115k (a) (3) and (4). Accordingly, I respectfully dissent in part.

I begin by noting my agreement with the majority's statement of the facts and procedural history of this case. I also agree with part I of the majority opinion, in which the majority concludes that the trial court's denial of the respondent's motion to dismiss is an appealable final judgment in the context of this case. Finally, I note that the jurisdictional issues in this case present a question of statutory interpretation, over which our review is plenary.[5] See, e.g., *Rutter* v. *Janis*, 334 Conn. 722, 730, 224 A.3d 525 (2020); see also General Statutes § 1-2z.

I

My analysis commences with whether Connecticut's courts lack subject matter jurisdiction over this case because Teagan was not "neglected . . . within this state," as required by § 46b-121 (a) (1). I agree with the petitioner's argument that § 46b-121 (a) (1) does not control the present case because that statute merely describes the Superior Court's territorial jurisdiction and must be read consistently with related statutes conferring jurisdiction in custody and neglect cases, in particular the UCCJEA, which governs child custody cases with interstate implications and the provisions of which expressly contemplate a child not present in the state.

"Jurisdiction of the [subject matter] is the power [of a tribunal] to hear and determine cases of the general class to which the proceedings in question belong." (Internal quotation marks omitted.) *Castro* v. *Viera*, 207 Conn. 420, 427, 541 A.2d 1216 (1988); accord *In re Jose B.*, 303 Conn. 569, 579–80, 34 A.3d 975 (2012). Pursuant to § 1-2z, I begin with an overview of the text of the relevant statutory provisions governing our Superior Court's jurisdiction over neglect proceedings. Section 46b-1 provides an extensive list of those "[m]atters within the jurisdiction of the Superior Court [that are] deemed to be family relations matters . . . ." See foot-

note 3 of this opinion. Included in that list are "juvenile matters as provided in [§] 46b-121 . . . ." General Statutes § 46b-1 (11). Juvenile matters, as provided by § 46b-121, "include all proceedings concerning uncared-for, neglected or abused children *within this state* . . . ." (Emphasis added.) General Statutes § 46b-121 (a) (1); see also General Statutes § 46b-121 (a) (2) (A) (similarly defining juvenile matters in criminal session of Superior Court to include, inter alia, "all proceedings concerning delinquent children within this state"). Although § 46b-121 (a) (1) can reasonably[6] be read to require the minor child to have or have had some physical presence in Connecticut,[7] it is axiomatic that a statute is not read in insolation but must be considered in the context of related statutes. See, e.g., *State* v. *Victor O.*, 320 Conn. 239, 248–49, 128 A.3d 940 (2016). Thus, it is significant that subsection (17) of § 46b-1 expressly provides that another family relations matter within the Superior Court's jurisdiction is one "affecting or involving . . . custody proceedings brought under the provisions of chapter 815p," namely, the UCCJEA.

Accordingly, I turn to the UCCJEA, which, in relevant part, broadly defines a "child custody proceeding" to "[mean] a proceeding in which legal custody, physical custody or visitation with respect to a child is an issue," including "a proceeding for . . . neglect, abuse, dependency . . . [and] termination of parental rights . . . in which the issue may appear. . . ." General Statutes § 46b-115a (4). The UCCJEA addresses jurisdiction in custody situations of interstate dimension by authorizing the Superior Court to exercise jurisdiction if

- Connecticut is the child's "home state";[8] General Statutes § 46b-115k (a) (1) and (2);

- there is no home state or the home state has declined jurisdiction on inconvenient forum grounds, and the child and at least one parent have a significant connection with this state; General Statutes § 46b-115k (a) (3) and (4);

- all home state and significant connection states have declined to exercise jurisdiction on the ground that this state would be a more appropriate forum under an inconvenient forum analysis; General Statutes § 46b-115k (a) (5); or

- no court of any other state would have jurisdiction under the foregoing grounds. General Statutes § 46b-115k (a) (6).

For convenience, these jurisdictional bases are commonly known as home state jurisdiction, significant connection jurisdiction, more appropriate forum jurisdiction, and default or vacuum jurisdiction, respectively.[9] See P. Hoff, Office of Juvenile Justice and Delinquency Prevention, Office of Justice Programs, "The Uniform Child-Custody Jurisdiction and Enforcement Act," Juv. Just. Bull., December, 2001, p. 5–6, available at http://www.ncjrs.gov/pdffiles1/ojjdp/189181.pdf (last

visited June 23, 2020).

Our legislature adopted the UCCJEA in 1999. See Public Acts 1999, No. 99-185. It replaced a similar scheme adopted in 1978 known as the Uniform Child Custody Jurisdiction Act (predecessor act). See Public Acts 1978, No. 78-318; see also Public Acts 1999, No. 99-185, § 39 (repealing General Statutes §§ 46b-90 through 46b-114). The UCCJEA was intended to "(1) [*a*]*void jurisdictional competition and conflict with courts of other* [*s*]*tates in matters of child custody which have in the past resulted in the shifting of children from* [*s*]*tate to* [*s*]*tate with harmful effects on their well-being*; (2) [*p*]*romote cooperation with the courts of other* [*s*]*tates to the end that a custody decree is rendered in that* [*s*]*tate which can best decide the case in the interest of the child*; (3) [*d*]*iscourage the use of the interstate system for continuing controversies over child custody*; (4) [d]eter abductions of children; (5) [a]void relitigation of custody decisions of other [s]tates in this [s]tate; [and] (6) [f]acilitate the enforcement of custody decrees of other [s]tates . . . ." (Emphasis added.) Unif. Child Custody Jurisdiction Enforcement Act (1997) § 101, comment, 9 U.L.A. (Pt. IA) 474 (2019); see, e.g., *In re Iliana M.*, 134 Conn. App. 382, 390, 38 A.3d 130 (2012).

Conflicting custody orders and the enforcement of orders had been a problem under the predecessor act to the UCCJEA in part because there was some question as to whether custody orders fell outside the purview of the full faith and credit clause of the United States constitution; U.S. Const., art. IV, § 1; and the predecessor act did not eliminate the possibility of the courts of multiple states having concurrent jurisdiction and entering competing custody orders. See P. Hoff, supra, pp. 2–3; see also 1 Restatement (Second), Conflict of Laws § 79, comment (c) and reporter's note to comment (c), pp. 238–39, 241 (1971). This encouraged noncustodial parents to continue to use their children to forum shop for more favorable custody arrangements. See, e.g., *Bellew* v. *Larese*, 288 Ga. 495, 499, 706 S.E.2d 78 (2011); In re *Felty* v. *Felty*, 66 App. Div. 3d 64, 71–72, 882 N.Y.S.2d 504 (2009); P. Hoff, supra, p. 2. To avoid the interjurisdictional conflict that had occurred under the predecessor act, the UCCJEA prioritizes jurisdiction over an initial custody determination by the state having the presumed closest connection to the child, with the highest priority given to the child's home state. See, e.g., *In re A.A.-F.*, 310 Kan. 125, 136, 444 P.3d 938 (2019); *Stephens* v. *Fourth Judicial District Court*, 331 Mont. 40, 44, 128 P.3d 1026 (2006); *Powell* v. *Stover*, 165 S.W.3d 322, 325 (Tex. 2005); see also Unif. Child Custody Jurisdiction Enforcement Act (1997) prefatory note, supra, 9 U.L.A. (Pt. IA) 461 (noting that prioritization of home state harmonized UCCJEA with federal Parental Kidnapping Prevention Act (PKPA), 28 U.S.C. § 1738A); P. Hoff, supra, p. 5 (noting that UCCJEA's rejection of

"the [predecessor act's] coequal treatment of home [s]tate and significant connection jurisdiction" was "intended to significantly reduce the number of situations in which more than one [s]tate has jurisdiction over a [child custody] matter" and to conform to PKPA).

In my view, the majority's conclusion that our Superior Court lacks jurisdiction because Teagan was not present "within this state," as contemplated by § 46b-121 (a) (1), fails to see the statutory forest through the trees. First, subdivision (17) of § 46b-1 contemplates proceedings under the UCCJEA as equally within the jurisdiction of the Superior Court as subdivision (11) of that statute, which refers to juvenile matters under § 46b-121. Thus, it is significant that the UCCJEA specifically contemplates an interstate child custody dispute and expressly disclaims the necessity of physical presence, in contrast to the more general § 46b-121 (a) (1), as § 46b-115k (c) provides: "Physical presence of, or personal jurisdiction over, a party or a child *is not necessary* or sufficient to make a child custody determination."[10] (Emphasis added.) The UCCJEA also states expressly that "[s]ubsection (a) [of § 46b-115k] is the *exclusive* jurisdictional basis for making a child custody determination by a court of this state." (Emphasis added.) General Statutes § 46b-115k (b).

This exclusivity language is particularly significant in light of the dispensation of physical presence or personal jurisdiction, given that the legislature adopted the UCCJEA subsequent to § 46b-121 (a) (1) and the "principle of legislative consistency [that] is vital to our consideration of the subject statute's relationship to existing legislation . . . governing the same subject matter . . . . [T]he legislature is always presumed to have created a harmonious and consistent body of law . . . . [T]his tenet of statutory construction . . . requires [this court] to read statutes together when they relate to the same subject matter . . . . Accordingly, [i]n determining the meaning of a statute . . . we look not only at the provision at issue, but also to the broader statutory scheme to ensure the coherency of our construction. . . . [T]he General Assembly is always presumed to know all the existing statutes and the effect that its action or [nonaction] will have upon any one of them." (Citation omitted; internal quotation marks omitted.) *Sokaitis* v. *Bakaysa*, 293 Conn. 17, 23, 975 A.2d 51 (2009). Thus, "we must read statutes to avoid conflict that would result in a nullification of one by the other . . . ." (Internal quotation marks omitted.) *State* v. *Victor O.*, supra, 320 Conn. 250; see id., 250–51 (rejecting interpretation of statute to require special parole in all cases that would "effectively nullify" portion of statute "authorizing probation in some of those cases"); *Sokaitis* v. *Bakaysa*, supra, 23–24 (rejecting "literal reading" of General Statutes § 52-553 voiding "[a]ll . . . wagers" that "results in several conflicts with other, more recent, statutes related to legal wager-

ing" (internal quotation marks omitted)).

Given our Superior Court's unquestioned competence to decide neglect cases as a class of matters; see, e.g., *Castro* v. *Viera*, supra, 207 Conn. 427; I conclude that § 46b-121 (a) (1) may easily be reconciled with the UCCJEA.[11] The genealogy and history of § 46b-121 render it apparent that the "within this state" limitation of § 46b-121 (a) (1) is merely a statement of the Superior Court's statewide *territorial* jurisdiction, which is a term that "refers to the connection between the territorial authority of the court and the action that has been brought before the court. . . . Under modern law . . . the basis of territorial jurisdiction has come to be defined primarily in terms of relationship between the place where the transaction in question occurred (including the place of residence of the parties to the transaction) and the territory of the state or nation in which the action is brought."[12] (Citation omitted; internal quotation marks omitted.) *Trichilo* v. *Trichilo*, 190 Conn. 774, 779–80 n.7, 462 A.2d 1048 (1983), quoting 1 Restatement (Second), Judgments c. 2, introductory note, and § 4 comment (a), pp. 22, 56 (1982); see *Trichilo* v. *Trichilo*, supra, 780 ("[t]he complaint, by virtue of the statutory presumption of agency necessarily implied by the allegation that the defendant owned one of the cars involved in the accident, set forth a sufficient relationship between this state and the defendant . . . to support the exercise of its territorial jurisdiction over him in this action").

The history and genealogy of § 46b-121 indicate that the phrase "within this state" is a statement of territorial jurisdiction. Some version of "within this state" has been included in the statute, now codified at § 46b-121 (a) (1), since 1921. See Public Acts 1921, c. 336, § 3 (P.A. 21-336); General Statutes (Supp. 1943) § 380g; Public Acts 1976, No. 76-436, § 14. It originated when a system of juvenile courts was created to adjudicate matters such as neglect and dependency; P.A. 21-336, § 2; and the jurisdiction of those local courts was limited to their respective territorial limits. See P.A. 21-336, § 3 (vesting "several juvenile courts" with exclusive original jurisdiction over proceedings concerning neglected children "within the territory over which their respective jurisdictions extend"). When a unified juvenile court was created in 1943, the statute was amended to refer to the jurisdiction of juvenile courts over neglected and dependent children "within its territorial limits . . . ." General Statutes (Supp. 1943) § 380g. In 1976, the legislature enacted No. 76-436, § 14, of the 1976 Public Acts, which amended the statutory language to "within this state," to reflect the transfer of the juvenile court's powers to the unified Superior Court with statewide jurisdiction. See General Statutes § 51-1a (b) ("[t]he territorial jurisdiction of the Supreme Court, the Appellate Court, and the Superior Court shall be coextensive with the boundaries of the state"); *Fort*

*Trumbull Conservancy, LLC* v. *New London*, 282 Conn. 791, 818–20, 925 A.2d 292 (2007) (Superior Court is court of statewide general jurisdiction, with venue in specific judicial districts not subject matter jurisdictional in nature); see also *McDonald* v. *Hugo*, 93 Conn. 360, 363–66, 105 A. 709 (1919) (describing difference in territorial jurisdiction of Superior Court judicial district and former city courts).

Viewing § 46b-121 (a) (1) as a statement of the Superior Court's territorial jurisdiction[13] renders it readily reconcilable with potentially conflicting provisions of the UCCJEA that specifically dispense with the presence of the child as a basis for jurisdiction. This is because the Restatement (Second) of Judgments instructs us that, "[i]n the course of the last century, the significance of presence of person or thing as a basis of territorial jurisdiction has diminished. Courts are far readier than in the past to give recognition to judgments of sister jurisdictions without going behind them to reexamine the merits. . . .

"In this perspective, development of the modern law of territorial jurisdiction may be better comprehended. In *International Shoe Co.* v. *Washington*, 326 U.S. 310, [316] 66 S. Ct. 154, 90 L. Ed. 95 (1945), the [United States] Supreme Court held that presence is not necessary for the exercise of in personam jurisdiction, stating that the significant question was whether, in the context of our federal system of government, the defendant has minimum contacts . . . such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." (Internal quotation marks omitted.) 1 Restatement (Second), Judgments, supra, c. 2, introductory note, pp. 24–25; see also *Bristol-Myers Squibb Co.* v. *Superior Court*,      U.S.      , 137 S. Ct. 1773, 1780, 198 L. Ed. 2d 395 (2017) (restrictions on personal jurisdiction "are a consequence of territorial limitations on the power of the respective [s]tates" (internal quotation marks omitted)).

"Apart from the [c]onstitutional requirement of minimum contacts, most states have established for themselves a limitation of comparable effect through the rule of forum non conveniens. . . . The minimum contacts rule and the rule of forum non conveniens express the same principle: *In general, a court should exercise jurisdiction over an action only if, considering the availability of other forums, the court is an appropriate locus for the adjudication.*" (Citation omitted; emphasis added; internal quotation marks omitted.) 1 Restatement (Second), Judgments, supra, § 4, comment (a), p. 57.

The policies underlying the concept of territorial jurisdiction are directly addressed by the terms of the UCCJEA, the fundamental policy of which is to adjudicate the custody of a minor in the court with the most appropriate locus and connection to the case. The uniform acceptance of the UCCJEA ensures that a state's

judgment as to custody will be recognized outside its territorial limits. See P. Hoff, supra, p. 5. Its rejection of the child's presence as a jurisdictional necessity is consistent with the modern law of territorial jurisdiction. The UCCJEA supplements minimum contacts, which would be established under home state or significant connection jurisdiction, with a comparable rule of inconvenient forum. See Unif. Child Custody Jurisdiction Enforcement Act (1997) § 201, comment (2), supra, 9 U.L.A. (Pt. IA) 506 ("[N]either minimum contacts nor service within the [s]tate is required for the court to have jurisdiction to make a custody determination. . . . The requirements of this section, plus the notice and hearing provisions of the [UCCJEA], are all that is necessary to satisfy due process.").

Because a uniform act is at issue, I have also considered case law from other jurisdictions that have adopted the UCCJEA and have jurisdictional statutes comparable to § 46b-121 (a) (1).[14] See, e.g., *Studer* v. *Studer*, 320 Conn. 483, 489–91, 131 A.3d 240 (2016); *Friezo* v. *Friezo*, 281 Conn. 166, 187–88, 914 A.2d 533 (2007). I have not found any case squarely considering whether the UCCJEA affords an independent basis for finding jurisdiction over a child who is not present in a state that has a separate statute like § 46b-121 (a) (1) providing a general grant of jurisdiction over neglect proceedings within the state.[15] The only case I have found that is close to on point is an intermediate appellate court decision from North Carolina, *In re Leonard*, 77 N.C. App. 439, 335 S.E.2d 73 (1985), in which the court concluded that the UCCJEA's predecessor act did not give the North Carolina courts subject matter jurisdiction over a petition to terminate parental rights to a child when the petitioner, his mother, had taken him from North Carolina to Ohio four days prior to the filing of the petition, because of a North Carolina state statute providing that "[t]he district court shall have exclusive original jurisdiction to hear and determine any petition relating to termination of parental rights to any child who resides in, is found in, or is in the legal or actual custody of a county department of social services or licensed child-placing agency in the district at the time of filing of the petition." (Internal quotation marks omitted.) Id., 440–41; see also *In re D.D.J.*, 177 N.C. App. 441, 443, 628 S.E.2d 808 (2006) (considering presence requirement under general jurisdictional statute without mention of UCCJEA). I find *Leonard* to be inapposite, however, because it arose under the predecessor act, which lacked the UCCJEA's language present in § 46b-115k (b) providing that it is the exclusive basis for determining jurisdiction, with the North Carolina state jurisdictional statute at issue having exclusivity language that is absent from § 46b-121 (a) (1). See *In re Leonard*, supra, 441 ("[t]he language of the [general jurisdictional] statute is that it shall not be 'used to circumvent' [the predecessor act], not that it shall 'be

in conformity with' [the predecessor act]"). Indeed, the court acknowledged the "unfortunate" result of its interpretation, which was specifically remedied by the UCCJEA, stating that, "[t]hough residence or physical presence of the child in the district at the time of filing is some indication of the child's connections with the state, the requirement is too easily overcome by a visit to the district on the filing date." Id. Accordingly, I do not find *Leonard* persuasive, insofar as it arose under a distinct statutory scheme. Cf. *Thomas* v. *Avant*, 370 Ark. 377, 386, 260 S.W.3d 266 (2007) (state venue statute requiring action for custody of illegitimate child to be brought in county where child resides inapplicable to interstate custody dispute with child who no longer resides in Arkansas given "the conflict between the state statute and the jurisdictional requirements of the UCCJEA and the PKPA"); *Feriole* v. *Feriole*, 468 So. 2d 1090, 1091 (Fla. App. 1985) (concluding that predecessor act provision that physical presence of child is not prerequisite for jurisdiction to determine custody superseded prior Florida common law under which court had no jurisdiction to adjudicate custody of minor child not physically present within territorial jurisdiction of court at time action was filed).

Finally, my interpretation of the Connecticut statutes is consistent with the purposes of the UCCJEA, which include avoiding the "shifting of children from [s]tate to [s]tate with harmful effects on their well-being" and "[promoting] cooperation with the courts of other [s]tates to the end that a custody decree is rendered in that [s]tate which can best decide the case in the interest of the child . . . ." Unif. Child Custody Jurisdiction Enforcement Act (1997) § 101, comment, supra, 9 U.L.A. (Pt. IA) 474. The respondents' story is not unique. I have found numerous cases with facts akin to this one, in which parents whose older children had previously been taken into the custody of state child protection agencies fled that state upon the imminent birth of another child in order to keep that newborn child from state custody. See, e.g., *In re Iliana M.*, supra, 134 Conn. App. 384–85; *In re J.S.*, 131 N.E.3d 1263, 1265 (Ill. App. 2019); *State ex rel. W.D.* v. *Drake*, 770 P.2d 1011, 1012 (Utah App.), cert. denied sub nom. *In re W.D.*, 789 P.2d 33 (Utah 1989). This tactic removes the child from any existing familial and social service networks that had been providing support to the family and thwarts the important role assigned to those child welfare agencies and courts with the greatest familiarity with the subject family. Adopting a construction of our statutes that countenances this tactic is in direct contradiction of the purpose of the UCCJEA. See, e.g., *Studer* v. *Studer*, supra, 320 Conn. 496 (rejecting construction of choice of law provision of Uniform Interstate Family Support Act, General Statutes § 46b-213q, that "would defeat one of the primary purposes underlying the uniform act, namely that of preventing forum shopping by the

parties to a child support order," by moving to state with more favorable laws). Accordingly, I interpret §§ 46b-1 and 46b-121 (a) (1) in light of the UCCJEA, and conclude that Teagan's lack of presence in this state does not by itself deprive our Superior Court of subject matter jurisdiction over the neglect petition.

## II

This brings me to whether Connecticut has jurisdiction over the present matter under the UCCJEA. Relying on the respondents' lengthy history of involvement with Connecticut's child welfare authorities and juvenile court, along with contemporaneous neglect and termination proceedings pending in this state pertaining to J, one of Teagan's siblings, the petitioner contends that Connecticut has significant connection jurisdiction under the UCCJEA, § 46b-115k (a) (3) or (4). The respondent contends in response that Connecticut lacks significant connection jurisdiction because Teagan had not lived in, received services in, or even been to Connecticut, and that neither of her parents no longer intended to reside in Connecticut. I agree with the petitioner and conclude that Connecticut has significant connection jurisdiction under either subdivision (3) or (4) of § 46b-115k.

Section 46b-115k (a) provides in relevant part: "[A] court of this state has jurisdiction to make an initial child custody determination if:

"(1) This state is the home state of the child on the date of the commencement of the child custody proceeding;

"(2) This state was the home state of the child within six months of the commencement of the child custody proceeding, the child is absent from the state, and a parent or a person acting as a parent continues to reside in this state;

"(3) A court of another state does not have jurisdiction under subdivisions (1) or (2) of this subsection, the child and at least one parent or person acting as a parent have a significant connection with this state other than mere physical presence, and there is substantial evidence available in this state concerning the child's care, protection, training and personal relationships;

"(4) A court of another state which is the home state of the child has declined to exercise jurisdiction on the ground that this state is the more appropriate forum under a provision substantially similar to section 46b-115q [inconvenient forum] or section 46b-115r [unjustifiable conduct],[16] the child and at least one parent or person acting as a parent have a significant connection with this state other than mere physical presence, and there is substantial evidence available in this state concerning the child's care, protection, training and personal relationships;

"(5) All courts having jurisdiction under subdivisions (1) to (4), inclusive, of this subsection have declined jurisdiction on the ground that a court of this state is the more appropriate forum to determine custody under a provision substantially similar to section 46b-115q or section 46b-115r; or

"(6) No court of any other state would have jurisdiction under subdivisions (1) to (5), inclusive, of this subsection." (Footnote added.)

I begin by observing that determining which, if any, of these UCCJEA provisions applies is somewhat complicated by the Florida trial court's decision. The court's memorandum of decision does not (1) refer expressly to the UCCJEA by name or statutory provision,[17] (2) utilize any of the UCCJEA's jurisdictional labels commonly relied on by courts, (3) make factual findings that are necessary to support certain jurisdictional grounds under the UCCJEA, or (4) discuss certain considerations relevant to the UCCJEA's inconvenient forum analysis.[18] Indeed, the record of the Florida trial court proceedings before the "general magistrate"[19] demonstrates some apparent confusion about whether Florida's courts had exercised home state or temporary emergency jurisdiction over Teagan.[20] The general magistrate's oral decision, which acknowledges the father's hotel employment and the respondents' apartment lease, appears to assume that Florida is Teagan's home state but considered the family history and then pending proceedings in Connecticut regarding J. The general magistrate cited rule 8.205 (c) of the Florida Rules of Juvenile Procedure, which is a court rule governing the transfer of juvenile cases to other jurisdictions,[21] and stated: "I still am going to find . . . that Connecticut is a more convenient foreign state, and it's in the best interest and will promote the efficient administration of justice to transfer jurisdiction to Connecticut." The general magistrate's decision to transfer the case to Connecticut subsequently was upheld on review by a Florida trial judge and later was affirmed in a one line, per curiam decision by an intermediate appellate court.

As a matter of comity with Florida's state courts—particularly given that the general magistrate's initial decision received two additional layers of judicial review—I assume that the Florida courts acted properly as a matter of Florida law to deem Connecticut a more appropriate forum for this case and to transfer jurisdiction from that state. Nevertheless, whether our trial court properly *accepted* jurisdiction over this case under the UCCJEA, as enacted in Connecticut, remains a separate question of law subject to independent consideration and review by the courts of this state. See *Brown* v. *Brown*, 195 Conn. 98, 114, 486 A.2d 1116 (1985) (The court applied the predecessor act and concluded that "[t]he relinquishing by the Florida courts of their jurisdiction over this matter to Connecticut on

the ground that Florida was an inconvenient forum clearly does not bind the courts of Connecticut to assume jurisdiction. It is for the courts of this state, and no other, to decide in proceedings brought here whether Connecticut constitutes a more appropriate or inconvenient forum for a custody determination.").

This deference to Florida is supported by the fact that it does not matter to my significant connection analysis whether the Florida court acted only on a temporary emergency basis, with no other court having home state jurisdiction; see General Statutes § 46b-115k (a) (3); or whether Florida had home state jurisdiction that it declined to exercise on the ground that Connecticut was a more appropriate and convenient forum.[22] See General Statutes § 46b-115k (a) (4). Under either basis, my independent analysis requires me to consider whether (1) "the child and at least one parent or person acting as a parent have a significant connection with this state other than mere physical presence," *and* (2) "there is substantial evidence available in this state concerning the child's care, protection, training and personal relationships . . . ." General Statutes § 46b-115k (a) (3) and (4). "Both mechanisms for establishing jurisdiction outside of the child's home state exemplify the overarching mission of the UCCJEA to prevent ongoing harm to neglected children, by providing highly elastic means for avoiding jurisdictional conflict." *In re J.R.*, 33 A.3d 397, 401 (D.C. 2011).

Having reviewed the record in this case, I conclude, on the basis of undisputed facts, that Connecticut has substantial connection jurisdiction. It is beyond cavil that, in this case of predictive neglect, the second element, namely, that "there is substantial evidence available in this state concerning the child's care, protection, training and personal relationships," is satisfied. General Statutes § 46b-115k (a) (4). The respondents lived in Connecticut their entire lives, they have extended family here, the conduct giving rise to the allegations of Teagan's predictive neglect occurred here, and the respondents have had extensive involvement with our courts, the department, and Connecticut service providers. See, e.g., *In re J.R.*, supra, 33 A.3d 401 (citing similar lengthy history); *In re M.S.*, 205 Vt. 429, 440–41, 176 A.3d 1124 (2017) (same); see also footnote 2 of this opinion.

Returning to the first element, namely, whether "the child *and* at least one parent or person acting as a parent have a significant connection with this state other than mere physical presence," there is similarly little dispute that the respondents have a significant connection with Connecticut. (Emphasis added.) General Statutes § 46b-115k (a) (3). The more difficult question is whether Teagan herself has a significant connection with this state. As the petitioner argues, the strength of a child's personal connection with a state will be more tenuous, by definition, when the child is

a newborn. See *In re D.T.*, 170 Vt. 148, 153, 743 A.2d 1077 (1999) ("It is difficult to conceive that a [ten week] old child can have 'significant connections' to a state. A court has to evaluate the situation presented, however, and in the case of a [ten week] old infant, a court could find that, in unique circumstances, the requisite connection to a state has been met."). The significance of a newborn's connections with a state is determined by considering the strength of her parents' present and future connections, conduct, and relationships with respect to that state. See, e.g., *H.T.* v. *Dept. of Human Resources*, 163 So. 3d 1054, 1066 (Ala. App. 2014) ("The child was only [a] few days old at the commencement of the dependency proceedings, and an assessment of significant past connections the child had to Alabama cannot be made. However, the evidence establishes that the mother had past, present, and future connections in Alabama and that the child had present and future connections with this state.").

My survey of cases from other jurisdictions in which significant connection jurisdiction was considered in neglect and dependency cases reveals that proof of the following factors will support a conclusion that an infant has a significant connection to a forum state as a result of parental conduct: (1) history of long-term residency in that state by a parent; (2) the ongoing presence of the child's siblings in the state, especially if they are in the state's legal custody; (3) the presence of other relatives in the state; or (4) a state's provision of child welfare or other social services to the family.[23] See id., 1066–67 (relying on mother's frequent moves between Alabama and Georgia, and her receipt of social services from Alabama, to establish significant connection between Alabama and newborn born in Georgia); *In re J.R.*, supra, 33 A.3d 401 (considering family's history of involvement with District of Columbia child welfare system, including fact that mother herself had been juvenile ward of District, in determining that District had significant connection to infant whose home state was Maryland); *In re D.S.*, 217 Ill. 2d 306, 319–20, 840 N.E.2d 1216 (2005) (holding that significant connection existed when six of infant's half siblings were Illinois residents who were subject of termination proceedings pending in Illinois); *In re J.S.*, supra, 131 N.E.3d 1271–72 (concluding that mother and infant had significant connection with Illinois when mother "ha[d] three other children [there who were no longer] in her care after findings of abuse and neglect," two of whom were currently under care of state agency, and "[t]he trial judge who ruled on the state's petition in [the infant's] case [was] the same judge presiding over the cases" of two children in state custody); *In re Arnold*, 532 S.W.3d 712, 718 (Mo. App. 2017) (concluding that parents and infant had significant connections to Missouri when infant's siblings had been under state court jurisdiction for several years and were then in legal

custody of state child welfare agency, and parents' criminal cases involving alleged abuse of one of child's siblings were pending in Missouri.); *In re M.S.*, supra, 205 Vt. 440–41 (concluding that significant connection existed when infant's "older brother was in the custody of [Vermont child protection agency] following serious unexplained physical injuries, and there were ongoing [court] proceedings . . . concerning that child's welfare"); see also C. Catalano, Annot., Construction and Application of Uniform Child Custody Jurisdiction and Enforcement Act's Significant Connection Jurisdiction Provision, 52 A.L.R.6th 433, 453, § 2 (2010) (citing cases).

Guided by these cases, I conclude that the fact that two of Teagan's siblings live in this state, with one, J, in the custody of the Connecticut department pending the termination of the respondents' parental rights to him, in connection with the respondents' lengthy history of receiving services from the department and residing here, is a sufficient basis to establish a significant connection between Teagan and this state. This is particularly so because no significant time had passed from their move from Connecticut to Florida that would have functioned to attenuate those connections to Connecticut while establishing Florida as their new home state.[24] Accordingly, I conclude that Connecticut's Superior Court has jurisdiction over the neglect petition under § 46b-115k (a) (3) or (4).[25]

Because I would affirm the decision of the trial court, I respectfully dissent in part.

[1] The mother is not participating in this appeal. Accordingly, all references herein to the respondent are to the father.

[2] "[T]he [petitioner in a neglect proceeding], pursuant to [General Statutes § 46b-120], need not wait until a child is actually harmed before intervening to protect that child. . . . This statute clearly contemplates a situation [in which] harm could occur but has not actually occurred. Our statutes clearly and explicitly recognize the state's authority to act before harm occurs to protect children whose health and welfare *may* be adversely affected and not just children whose welfare has been affected. . . . The doctrine of predictive neglect is grounded in the state's responsibility to avoid harm to the well-being of a child, not to repair it after a tragedy has occurred. . . . Thus, [a] finding of neglect is not necessarily predicated on actual harm, but can exist when there is a potential risk of neglect." (Emphasis in original; internal quotation marks omitted.) *In re Joseph W.*, 305 Conn. 633, 644–45, 46 A.3d 59 (2012). To establish a case of predictive neglect under § 46b-120, "the trial court must find that it is more likely than not that, if the child remained in the current situation, the child would be denied proper care and attention, physically, educationally, emotionally or morally . . . or would be permitted to live under conditions, circumstances or associations injurious to the well-being of the child or youth . . . ." (Citation omitted; internal quotation marks omitted.) Id., 646.

[3] General Statutes § 46b-1 provides: "Matters within the jurisdiction of the Superior Court deemed to be family relations matters shall be matters affecting or involving: (1) Dissolution of marriage, contested and uncontested, except dissolution upon conviction of crime as provided in section 46b-47; (2) legal separation; (3) annulment of marriage; (4) alimony, support, custody and change of name incident to dissolution of marriage, legal separation and annulment; (5) actions brought under section 46b-15; (6) complaints for change of name; (7) civil support obligations; (8) habeas corpus and other proceedings to determine the custody and visitation of children; (9) habeas corpus brought by or on behalf of any mentally ill person except a person charged with a criminal offense; (10) appointment of a commission

to inquire whether a person is wrongfully confined as provided by section 17a-523; (11) *juvenile matters as provided in section 46b-121*; (12) all rights and remedies provided for in chapter 815j; (13) the establishing of paternity; (14) appeals from probate concerning: (A) Adoption or termination of parental rights; (B) appointment and removal of guardians; (C) custody of a minor child; (D) appointment and removal of conservators; (E) orders for custody of any child; and (F) orders of commitment of persons to public and private institutions and to other appropriate facilities as provided by statute; (15) actions related to prenuptial and separation agreements and to matrimonial and civil union decrees of a foreign jurisdiction; (16) dissolution, legal separation or annulment of a civil union performed in a foreign jurisdiction; (17) custody proceedings brought under the provisions of chapter 815p; and (18) all such other matters within the jurisdiction of the Superior Court concerning children or family relations as may be determined by the judges of said court." (Emphasis added.)

General Statutes § 46b-121 provides in relevant part: "(a) (1) Juvenile matters in the civil session include *all proceedings concerning uncared-for, neglected or abused children within this state*, termination of parental rights of children committed to a state agency, adoption proceedings pursuant to section 46b-129b, matters concerning families with service needs, contested matters involving termination of parental rights or removal of guardian transferred from the Probate Court and the emancipation of minors, but does not include matters of guardianship and adoption or matters affecting property rights of any child over which the Probate Court has jurisdiction, except that appeals from probate concerning adoption, termination of parental rights and removal of a parent as guardian shall be included.

* * *

"(b) (1) In juvenile matters, the Superior Court shall have authority to make and enforce such orders directed to parents, including any person who acknowledges before the court paternity of a child born out of wedlock, guardians, custodians or other adult persons owing some legal duty to a child therein, as the court deems necessary or appropriate to secure the welfare, protection, proper care and suitable support of a child subject to the court's jurisdiction or otherwise committed to or in the custody of the Commissioner of Children and Families. . . ." (Emphasis added.)

[4] General Statutes § 46b-115k provides: "(a) Except as otherwise provided in section 46b-115n, a court of this state has jurisdiction to make an initial child custody determination if:

"(1) This state is the home state of the child on the date of the commencement of the child custody proceeding;

"(2) This state was the home state of the child within six months of the commencement of the child custody proceeding, the child is absent from the state, and a parent or a person acting as a parent continues to reside in this state;

"(3) A court of another state does not have jurisdiction under subdivisions (1) or (2) of this subsection, the child and at least one parent or person acting as a parent have a significant connection with this state other than mere physical presence, and there is substantial evidence available in this state concerning the child's care, protection, training and personal relationships;

"(4) A court of another state which is the home state of the child has declined to exercise jurisdiction on the ground that this state is the more appropriate forum under a provision substantially similar to section 46b-115q or section 46b-115r, the child and at least one parent or person acting as a parent have a significant connection with this state other than mere physical presence, and there is substantial evidence available in this state concerning the child's care, protection, training and personal relationships;

"(5) All courts having jurisdiction under subdivisions (1) to (4), inclusive, of this subsection have declined jurisdiction on the ground that a court of this state is the more appropriate forum to determine custody under a provision substantially similar to section 46b-115q or section 46b-115r; or

"(6) No court of any other state would have jurisdiction under subdivisions (1) to (5), inclusive, of this subsection.

"(b) Subsection (a) of this section is the exclusive jurisdictional basis for making a child custody determination by a court of this state.

"(c) Physical presence of, or personal jurisdiction over, a party or a child is not necessary or sufficient to make a child custody determination."

[5] I note that, on December 4, 2019, we sua sponte ordered the parties to file "simultaneous supplemental briefs . . . addressing the following questions:

"If this court were to conclude that . . . § 46b-115k (a) (5) is not applica-

ble to the present case because there is no basis to conclude that Florida exercised home state or significant connection jurisdiction:

"(1) Would Connecticut have significant connection jurisdiction under § 46b-115k (a) (3) of the [UCCJEA]?

"(2) If not, would Connecticut have default jurisdiction under § 46b-115k (a) (6)?

"(3) If Connecticut has either significant connection or default jurisdiction under the UCCJEA, would . . . §§ 46b-1 (11) and 46b-121 (a) (1), which limit jurisdiction over juvenile matters to a child 'neglected . . . within this state,' otherwise preclude the exercise of jurisdiction in the present case?"

[6] In my view, the majority's construction of §§ 46b-1 and 46b-121 (a) (1), and the UCCJEA, is reasonable, rendering those statutes ambiguous for purposes of the § 1-2z analysis. Accordingly, I consult extratextual sources to aid my determination of the legislature's intent. See, e.g., *Hynes* v. *Jones*, 331 Conn. 385, 393, 204 A.3d 1128 (2019).

[7] Although the phrase "within this state," as used in § 46b-121 (a) (1), has not previously been construed by our courts, whether it means that neglect of the child has occurred or likely will occur within this state, that the neglected child is present in this state, and/or that the child's domicile is in this state, it is undisputed that none of these conditions exists.

[8] The UCCJEA defines the "home state," in relevant part, as "the state in which a child lived with a parent or person acting as a parent for at least six consecutive months immediately before the commencement of a child custody proceeding. In the case of a child less than six months old, the term means the state in which the child lived from birth with any such parent or person acting as a parent. . . ." General Statutes § 46b-115a (7). I note that "cases in other states have concluded [that] time spent in a forum after the filing of a child custody petition may not be counted [toward] the time necessary for home state jurisdiction." *In re Marriage of Sareen*, 153 Cal. App. 4th 371, 379, 62 Cal. Rptr. 3d 687 (2007), cert. denied sub nom. *Sareen* v. *Sareen*, 552 U.S. 1259, 128 S. Ct. 1670, 170 L. Ed. 2d 357 (2008).

[9] Although the commentary to the UCCJEA specifically characterizes the jurisdictional provisions as conferring "subject matter jurisdiction"; Unif. Child Custody Jurisdiction Enforcement Act (1997) § 201, comment (2), 9 U.L.A. (Pt. IA) 505 (2019); some courts and commentators disagree with that characterization of the UCCJEA and its predecessor, the Uniform Child Custody Jurisdiction Act (predecessor act), instead viewing them as (1) governing personal jurisdiction; see, e.g., *Harris* v. *Young*, 473 N.W.2d 141, 143 (S.D. 1991) (predecessor act); B. Atwood, "Child Custody Jurisdiction and Territoriality," 52 Ohio St. L.J. 369, 375 (1991) (citing disagreement among commentators and courts under predecessor act); see also 750 Ill. Comp. Stat. Ann. 60/208 (West 2019) (referring to UCCJEA as prescribing personal jurisdiction); (2) pertaining to venue; see, e.g., *In re Custody of A.C.*, 165 Wn. 2d 568, 573 n.3, 200 P.3d 689 (2009) (noting that it would have been more appropriate for UCCJEA to refer to "exclusive venue" instead of "subject matter jurisdiction," but using latter term for consistency); see also, e.g., *Friedman* v. *Eighth Judicial District Court ex rel. Clark*, 127 Nev. 842, 848 n.5, 264 P.3d 1161 (2011) (same); or (3) as a procedural limit on the court's authority, which also may be waivable. See *In re J.S.*, 131 N.E.3d 1263, 1267–68 (Ill. App. 2019) ("[W]hile the UCCJEA uses the term jurisdiction to describe conditions that must be met before an Illinois court can decide a question of initial child custody, jurisdiction here does not mean a precondition to the exercise of the court's inherent authority. . . . Rather, jurisdiction under the UCCJEA is simply a procedural limit on when the court may hear initial custody matters. . . . To define the term more broadly would conflict with [well established] law holding that the [trial] court has the authority, pursuant to our constitution, to consider all justiciable matters that do not fall within the original and exclusive jurisdiction of [the Illinois] [S]upreme [C]ourt." (Citations omitted; internal quotation marks omitted.)); *Williams* v. *Williams*, 555 N.E.2d 142, 145 (Ind. 1990) (predecessor act). I suggest, however, that it is difficult to square the characterization of the UCCJEA as relating to personal jurisdiction with the UCCJEA provision expressly stating that personal jurisdiction is not necessary. See General Statutes § 46b-115k (c).

[10] Indeed, when the UCCJEA contemplates jurisdiction depending on the presence of the minor child in the state, it says so specifically in its temporary emergency jurisdiction provision, codified at General Statutes § 46b-115n, which is significant because, "[w]here a statute, with reference to one subject contains a given provision, the omission of such provision from a similar statute concerning a related subject . . . is significant to show that a differ-

ent intention existed." (Internal quotation marks omitted.) *Valliere* v. *Commissioner of Social Services*, 328 Conn. 294, 314, 178 A.3d 346 (2018); see General Statutes § 46b-115n (a) ("[a] court of this state has temporary emergency jurisdiction if the child is present in this state and (1) the child has been abandoned, or (2) it is necessary in an emergency to protect the child because the child, a sibling or a parent has been, or is under a threat of being, abused or mistreated").

For a helpful explanation of the relationship between home state and temporary emergency jurisdiction, in particular when a court's temporary jurisdiction may transition to a permanent basis for jurisdiction under the UCCJEA, see the Vermont Supreme Court's recent decision in *In re M.P.*, 219 A.3d 1315, 1322–23 (Vt. 2019).

[11] Even without reconciliation, I note that, as the later enacted statute, the UCCJEA's directive must control over § 46b-121, to the extent that they are in irreconcilable conflict. See *Bouley* v. *Norwich*, 222 Conn. 744, 758–59, 610 A.2d 1245 (1992) ("[E]nactments by the General Assembly are presumed to repeal earlier inconsistent ones to the extent that they are in conflict. . . . Because repeal by implication is generally disfavored, however, the principle applies only when the relevant statutes cannot stand together." (Citation omitted; internal quotation marks omitted.)). Reliance on this rule of construction is particularly apt when the later enacted provision is part of a uniform act like the UCCJEA.

[12] The Restatement (Second) of Judgments provides a concise explanation of the concept of territorial jurisdiction. "Courts are constituted by governments, including national governments within the international community and state governments within our federal union. The governments themselves have an authority that for most purposes is defined by reference to their legal boundaries or territorial limits. Hence, the courts constituted by them have an authority that is correspondingly defined, at least in part, in territorial terms.

"Historically, the territorial jurisdiction of courts was based upon the presence of a person or thing within the legal boundaries of the government that created the court. . . . When a person was within those boundaries, jurisdiction described as 'in personam' could be exercised over him; when a thing was within those boundaries, jurisdiction described as 'in rem' or 'quasi in rem' could be exercised to determine interests in the thing.

"Presence of the person or thing remains of significance in the law of territorial jurisdiction. Generally speaking, it remains the rule that enforcement of a judgment may be effectuated only by executive officials (such as the sheriff or marshal) of the government in which the enforcement is undertaken. Hence, outside the territorial limits of a court's jurisdiction, the coercive effectiveness of its judgment depends upon the judgment's being given recognition by the authorities of another government, under a principle of comity or by virtue of legal provisions such as the [f]ull [f]aith and [c]redit [c]lause of the [United States] [c]onstitution. This means that a court's judgment even though final is not of its own legal authority the last word in providing legal redress outside its territorial limits. Correlatively, the practical effectiveness of a judgment against someone or something outside the court's territorial jurisdiction depends upon cooperation of another government." (Citation omitted.) 1 Restatement (Second), Judgments c. 2, introductory note, pp. 22–23 (1982); see also *Pennoyer* v. *Neff*, 95 U.S. 714, 722, 24 L. Ed. 565 (1878) ("The several [s]tates are of equal dignity and authority, and the independence of one implies the exclusion of power from all others. And so it is laid down by jurists, as an elementary principle, that the laws of one [s]tate have no operation outside of its territory, except so far as is allowed by comity; and that no tribunal established by it can extend its process beyond that territory so as to subject either persons or property to its decisions.").

[13] The principal effect of characterizing a condition as an expression of territorial jurisdiction, rather than subject matter jurisdiction, is the possibility of the former being subject to waiver. See, e.g., *B.J.P.* v. *R.W.P.*, 637 A.2d 74, 78–79 (D.C. 1994) ("[t]he purported lack of subject matter jurisdiction based on territorial considerations—a fair characterization of the asserted defect here—has been held to be analytically similar to improper venue; it does not go to the power of the court to adjudicate the case, and may be waived if not asserted in [a] timely fashion" (emphasis omitted)); 1 Restatement (Second), Judgments, supra, c. 2, introductory note, p. 28 (distinguishing territorial jurisdiction on basis of waiver). But see *State* v. *Dudley*, 364 S.C. 578, 582, 614 S.E.2d 623 (2005) ("Although territorial jurisdiction is not a component of subject matter jurisdiction, we hold that

it is a fundamental issue that may be raised by a party or by a court at any point in the proceeding. . . .The exercise of extraterritorial jurisdiction implicates the state's sovereignty, a question so elemental that we hold it cannot be waived by conduct or by consent." (Citation omitted; footnote omitted.)). Waiver is not at issue in the present case, however, because the respondent has consistently objected to the exercise of jurisdiction over the case given Teagan's lack of presence in this state.

[14] I agree with the majority that a survey of statutes governing jurisdiction over neglect and dependency proceedings reveals that most states afford a general grant of jurisdiction over neglect proceedings without an express limitation relating to the child's connection to the state or relevant political subdivision, but there are several states that have statutes requiring such connections. See, e.g., Mich. Comp. Laws Serv. § 712A.2 (b) (LexisNexis Cum. Supp. 2019) ("juvenile under 18 years of age found within the county"); Mo. Ann. Stat. § 211.031 1. (1) (West 2017) ("any child who may be a resident of or found within the county"); Mont. Code Ann. § 41-3-103 (1) (a) (2019) ("a youth who is within the state of Montana for any purpose"); R.I. Gen. Laws § 14-1-5 (1) (Cum. Supp. 2019) ("any child residing or being within the state"). Some of these statutes expressly designate these limitations as matters of personal jurisdiction or venue. See Okla. Stat. Ann. tit. 10A, § 2-2-102 (A) (1) (West 2018) (personal jurisdiction exists "where a child . . . resides . . . is found, or . . . is alleged to be or is found to be in need of supervision"); W. Va. Code Ann. § 49-4-601 (a) (LexisNexis 2015) (venue is proper "in the county in which the child resides," "in the county in which the custodial respondent or other named party abuser resides, or in which the abuse or neglect occurred"); see also *In re Doe*, 83 Haw. 367, 373, 926 P.2d 1290 (1996) (characterizing Haw. Rev. Stat. § 587-11, which was repealed in 2010 and which provided that "the court shall have exclusive original jurisdiction in a child protective proceeding concerning any child who was or is found within the [s]tate at the time the facts and circumstances occurred, are discovered, or are reported to the department," as matter of personal jurisdiction (internal quotation marks omitted)).

[15] The cases do not consider whether the UCCJEA provides a basis for jurisdiction independent of a potentially conflicting state statute but, instead, stand for the otherwise unremarkable proposition, relied on by the majority, that the UCCJEA may cabin a broader statutory grant of jurisdiction in cases of interstate dimension. See, e.g., *In re A.A.-F.*, supra, 310 Kan. 135 ("[T]he Revised Kansas Code for Care of Children generally confers original jurisdiction on Kansas courts to hold proceedings concerning any child who may be a child in need of care. . . . But the [l]egislature placed limits on this jurisdiction, making it '[s]ubject to the [UCCJEA].' " (Citations omitted.)); *Banerjee* v. *Banerjee*, 258 So. 3d 699, 701–702 (La. App. 2017) ("[e]ven if a Louisiana court has subject matter jurisdiction, that jurisdiction must be declined based on limitations imposed by the UCCJEA"); *DeLima* v. *Tsevi*, 301 Neb. 933, 937, 921 N.W.2d 89 (2018) ("[T]here are other statutes outside the UCCJEA that confer jurisdiction to decide child custody matters. . . . But while other statutes may confer jurisdiction generally, [Nebraska's statute] directs courts to determine whether jurisdiction exists over a specific child custody proceeding under the UCCJEA." (Citations omitted.)); see also *Rosen* v. *Celebrezze*, 117 Ohio St. 3d 241, 249, 883 N.E.2d 420 (2008) ("the mere fact that the Ohio court has basic statutory jurisdiction to determine custody matters in [legal separation] and divorce cases . . . does not preclude a more specific statute like [the UCCJEA] from patently and unambiguously divesting the court of such jurisdiction" (citations omitted)).

Other cases have similarly analyzed the question of jurisdiction under both the general jurisdictional statute and the UCCJEA, deeming that the exercise of jurisdiction must be proper under the terms of each. See *State ex rel. R.P.* v. *Rosen*, 966 S.W.2d 292, 297 (Mo. App. 1998) (applying predecessor act); *In re K.U.-S.G.*, 208 N.C. App. 128, 131–32, 702 S.E.2d 103 (2010) (considering general provision providing jurisdiction over child present in district and UCCJEA, because termination proceeding required North Carolina court to modify order issued by Pennsylvania court); cf. *Arizona Dept. of Economic Security* v. *Grant ex rel. Maricopa*, 232 Ariz. 576, 581–82, 307 P.3d 1003 (App. 2013) (determining that jurisdiction was proper under UCCJEA because neglected or abused child was found in state, even though jurisdiction was lacking under common law because alleged abuse occurred outside of state).

Finally, I note the decisions of two state courts that considered jurisdiction over proceedings to terminate parental rights, which also are subject to the UCCJEA, when a state statute vested exclusive original jurisdiction over a

petition relating to termination of parental rights with respect to a child who had a specific presence in the state. Despite the child's lack of presence at the time the petition to terminate parental rights was filed, the courts held that jurisdiction existed under the UCCJEA because of its exclusive continuing jurisdiction provision, as the custodial guardians had resided in the state at the time an initial custody order had been issued. See *In re G. B.*, 167 N.H. 99, 102–105, 105 A.3d 615 (2014); *In re H.L.A.D.*, 184 N.C. App. 381, 388–89, 646 S.E.2d 425 (2007), aff'd, 362 N.C. 170, 655 S.E.2d 712 (2008). Accordingly, these cases do not provide guidance in the present case, which raises the question of whether the UCCJEA affords our Superior Court with jurisdiction to render an initial custody determination, rather than a continuing one.

[16] The decisions of both the Florida court and the Connecticut trial court imply that the respondents engaged in unjustifiable conduct by leaving Connecticut for the purpose of avoiding the department's involvement with Teagan. It does not appear, however, that General Statutes § 46b-115r applies to the present case because that statute applies when the person engaging in such misconduct seeks to "invoke [the court's] jurisdiction . . . ." General Statutes § 46b-115r (a). By fleeing Connecticut, the respondents clearly were not trying to *invoke* the jurisdiction of any court.

[17] The counterpart to § 46b-115k in Florida's UCCJEA is structured differently than the Connecticut statute, but it is the same substantively in all material respects. See Fla. Stat. Ann. § 61.514 (West 2012).

[18] For example, there is no written indication that the Florida court considered the distance between Florida and Connecticut or the parties' relative financial circumstances. Cf. General Statutes § 46b-115q (b) (3) and (4). Although the respondents did not make a specific argument regarding these factors, the father submitted into evidence a paystub reflecting an hourly wage of $9.50, which of course pales in comparison to the resources of a state child protection agency. Although the transcript of the Florida trial court hearing mentions items such as the fact that the respondents had signed an apartment lease, the father had obtained employment at a hotel, and the mother had commenced individual counseling sessions in Florida, the respondents did not raise any specific hardship arguments before the Florida court, ultimately leaving it to their counsel in Connecticut to raise these legitimate concerns with respect to the effect of Connecticut's exercise of jurisdiction on visitation and the provision of services to reunify the family.

[19] A "general magistrate" is a quasi-judicial officer who conducts proceedings in a variety of matters under the supervision of a Florida state trial judge. See Fla. Fam. L. R. Proc. 12.490 (governing appointment of general magistrates by judges of state circuit courts and magistrates' responsibilities); R. Prugh, "Title Procedure Before General Magistrates and Child Support Enforcement Hearing Officers," 81 Fla. B.J. 77, 77–78 (2007).

[20] For example, at one point, the court and both of the parties to the Florida proceedings, specifically the father and the Florida child welfare agency, appeared to agree that the Florida court was exercising only temporary emergency jurisdiction over the custody matter, which is an exception to the original jurisdiction dictates of the UCCJEA. See footnote 10 of this opinion. This basis was reflected in the UCCJEA analysis in the Florida child welfare agency's appellate brief filed in that state's intermediate appellate court. Ultimately, the Florida agency contended in that brief that the trial court's transfer decision was proper because Connecticut has either significant connection jurisdiction or exclusive continuing jurisdiction, the latter based on the case then pending regarding Teagan's sibling, J, and our trial court's representation to the Florida court that Teagan's case would be consolidated with that pending matter.

On the other hand, the father also appeared to contend, on the basis of his employment and apartment lease, that Florida is the family's domicile and therefore should be deemed Teagan's home state. The Florida child welfare agency took the position in its appellate brief that Florida lacked home state jurisdiction because of evidence, namely, a phone call placed to the Florida department by one of their relatives, that the respondents planned to leave Florida as soon as Teagan was released from the hospital to avoid that agency's intervention as establishing that they did not intend to remain in Florida (i.e., that Teagan would never have "lived from birth" with her parents in Florida). Although the father criticized the general magistrate's decisions for failing to make certain findings of fact under the UCCJEA, the Florida child welfare agency contended in its appellate brief that he had failed to preserve that claim or take advantage of procedures available to challenge the magistrate's decision prior to its approval by a

state trial judge. Ultimately, the Florida intermediate appellate court upheld the decision of the trial court without issuing an opinion that would have provided additional guidance.

[21] Rule 8.205 (c) of the Florida Rules of Juvenile Procedure provides: "Transfer of Cases Among States. If it should appear at any time that an action is pending in another state, the court may transfer jurisdiction over the action to a more convenient forum state, may stay the proceedings, or may dismiss the action."

I note that Florida's juvenile rules expressly contemplate and require compliance with the UCCJEA. See Fla. R. Juv. Proc. 8.203 ("Any pleading filed commencing proceedings as set forth in rule 8.201 shall be accompanied by an affidavit, to the extent of affiant's personal knowledge, under the Uniform Child Custody Jurisdiction and Enforcement Act. Each party has a continuing duty to inform the court of any custody proceeding in this or any other state of which information is obtained during the proceeding."); see also *D.M.* v. *J.D.M. ex rel. C.F.*, 814 So. 2d 1112, 1116 (Fla. App. 2002) (citing rule 8.203 requiring compliance with predecessor act).

[22] For purposes of my analysis, and giving the respondent every jurisdictional benefit of the doubt, I deem it particularly appropriate to assume, consistent with the UCCJEA's prioritization of home state jurisdiction, that Florida was in fact Teagan's home state. I note, however, that, contrary to the petitioner's argument in her initial brief, the fact that Florida is deemed Teagan's home state does not permit it to bestow jurisdiction on Connecticut pursuant to § 46b-115k (a) (5) solely on the basis of its more convenient forum finding. This argument is inconsistent with the plain language of § 46b-115k (a) (5), which requires "all" courts having significant connection jurisdiction to similarly decline jurisdiction along with those having home state jurisdiction. On the facts of this case, with only two states involved and Connecticut having that significant connection, all UCCJEA roads lead back to Connecticut in any event. Accordingly, I similarly need not address the petitioner's second jurisdictional argument under the UCCJEA, namely, that Connecticut could exercise default jurisdiction under § 46b-115k (a) (6).

[23] I do not consider the cases examining substantial connection in the context of custody disputes between parents to provide significant guidance in the child neglect context. In those cases, a substantial connection exists when one parent resides in the state and exercises parenting time in that state; see, e.g., *White* v. *Harrison-White*, 280 Mich. App. 383, 392–94, 760 N.W.2d 691 (2008) (citing this standard after comprehensive review of case law from other jurisdictions); or when an older child maintains a relationship with relatives or friends in the state. See, e.g., *Rennie* v. *Rosenthol*, 995 A.2d 1217, 1222 n.6 (Pa. Super. 2010) (citing cases applying this factor).

[24] I need not consider whether it matters to the significant connection analysis that the respondents' parental rights to J had not yet been terminated at the time that the petitioner filed Teagan's neglect petition in the trial court for purposes of considering any relationships between the respondents, J, and Teagan. See, e.g., *Khawam* v. *Wolfe*, 84 A.3d 558, 563 (D.C. 2014) ("[i]n determining whether these [UCCJEA] requirements are met, the trial court considers the situation at the time the initial custody application is filed"); *Tomlinson* v. *Weatherford*, 399 P.3d 961, 965 (N.M. App. 2017) ("[t]he facts relevant to jurisdiction under the [UCCJEA] are those that existed at the time the petition was filed"); see also *In re Aiden L.*, 16 Cal. App. 5th 508, 516, 224 Cal. Rptr. 3d 400 (2017) (applying this principle); *Dept. of Human Services* v. *T.F.*, 292 Or. App. 356, 359, 425 P.3d 480 (2018) (same).

[25] In light of my basis for this conclusion, I need not address the respondent's arguments challenging the Connecticut trial court's decision, insofar as that court stated that, because the respondents had moved to Florida to avoid involvement with the Connecticut department, they were not entitled to "equitable redress." The conferral of statutory jurisdiction eliminates equitable considerations. I similarly leave to another day the respondent's novel claim that this equitable determination equated to imposing a duty on the respondents to remain in Connecticut, which, in turn, violated their constitutional right to interstate travel.